**SILENCE LAW GROUP, PLLC**
20235 N. Cave Creek Rd., Ste. 104 #460
Phoenix, AZ 85024
Jeffrey A. Silence (029143)
(602) 321-1538
jeff@silencelaw.com

**GAMMAGE & BURNHAM, P.L.C.**
40 North Central Avenue 20th Floor
Phoenix, AZ 85004
Gina E. Carrillo (030579)
(602) 256-0566
gcarrillo@gblaw.com
docket@gblaw.com

*Attorney for Kip Daniels*

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kip Daniels,<br>Plaintiff,<br>v.<br>Maximus Federal Services, Inc.,<br>Defendant. | Case No. 2:22-cv-01702-SMB<br>**PLAINTIFF KIP DANIELS' RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AND SEPARATE STATEMENT OF FACTS**<br>(Assigned to the Honorable Susan M. Brnovich) |

////

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**<u>Objections</u>**

1. The deposition transcripts contain four pages of testimony on each page. Defendant also included the index.
2. Exhibit 11 is not relevant.
3. Exhibits 12 through 14 each contain unrelated emails submitted as one exhibit.
4. Defendant's SOF ¶¶ 27, 32-33, 38, 42, and 50 contain more than one fact.
5. Defendant's SOF ¶ 42 is not supported by the cited evidence.

**<u>Response to Defendant's Statement of Facts</u>**

Kip admits **SOF ¶¶ 1-10, 12-15, 17-20, 22-25, 29-30, 34-37, 39-40, and 45-47**.

1. **SOF ¶ 11**. Admit Kip signed the June 2019 agreement. Deny any implication the June 2019 agreement impacted the "Commission Agreement." **Ex. A ¶ 40-44**, **Ex. 11.**

2. **SOF ¶ 16**. Deny. **Ex. A ¶ 163.**

3. **SOF ¶ 21**. Deny. **Ex. A ¶¶ 117-130, 194-222, Ex. B 14:20-25, 20:1-22, Ex. 3.**

4. **SOF ¶ 26.** Deny. **Ex. A ¶¶ 35-39, 45-141, 117-130, 194-211, Ex. B 14:20-25, 102:5-105:3, Ex. C. 45:11-46:5, 157: 8-158:3, 159:7-14, 160:1-9, Ex. D. 57:3-13, 78:1-4, Ex. II, Ex. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.**

5. **SOF ¶ 27**. Deny. **Ex. A ¶¶ 35-39, 45-116, 131-171, 194-211, 223-224, Ex. B 20:1-22:3, Ex. C. 160:1-9, Ex. 3.** Admit Kip was paid $200,000. **Ex. BB.**

6. **SOF ¶ 28**. Deny. **Ex. A ¶¶ 35-39, 45-116, 131-171, 194-201, 223-224**, **Ex. B 14:20-25, 102:5-105:3, Ex. C. 45:11-46:5, 157: 8-158:3, 159:7-14, 160:1-9, Ex. D. 57:3-11, 78:1-4, Ex. II, Ex. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.**

7. **SOF ¶ 31**. Admit, except deny Kip is seeking payment for Missouri UI. **Ex. W.**

8. **SOF ¶ 32**. Deny. Kip was paid $111,838.40 for these agreements on March 24, 2023, but the payments were not timely. **Ex. A ¶¶ 225-233, Ex. B 14:20-25.**

9. **SOF ¶ 33**. Deny. Kip is owed commissions for these agreements. **Ex. A ¶¶35-39, 45-116, 131-201, 223-224**, **Ex. B 14:20-25, 102:5-105:3, Ex. C. 45:11-46:5, 157: 8-158:3, 159:7-14, 160:1-9, Ex. D. 57:3-11, 78:1-4, Ex. II, Ex. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.** Admit Kip was not paid for these agreements.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

10. **SOF ¶ 38**. Admit Naughton sent the June 17, 2022 email. Deny any implication that the Commission Agreement allows Defendant to reduce Kip's commissions if the customer pays less, Kip was required to engage in "pre-marketing and client and partner interface" to earn a commission, and that Kip was not entitled to commissions if the agreement arose from a client's RFP. **Ex. A ¶ 96-98, 142-152, 153-161, Ex. 3.**

11. **SOF ¶ 41**. Denied as vague. Maximus terminated Kip March 17, 2023. **Ex. Z.**

12. **SOF ¶ 42**. Deny. **Ex. A ¶¶ 254-261.** Do not dispute that Naughton and Slaughter worked until approximately May 30, 2023.

13. **SOF ¶ 43**. Deny. **Ex. A ¶¶ 261-262.**

14. **SOF ¶ 44**. Deny. **Ex. A ¶¶ 254-272, Ex. Z.**

15. **SOF ¶ 48**. Deny. Kip is owed at least $140,059.45 for Summit One and possibly more if Summit One extended the terms of the agreement. **Ex. A ¶¶ 105-107.**

16. **SOF ¶ 49**. Deny. Kip was paid $45,637.50, but Defendant still owes him at least $140,059.45. **Ex. A ¶¶ 105-107, Ex. W.**

17. **SOF ¶ 50**. Deny. Kip is owed at least $140,049.45 for Summit One. **Ex. A ¶¶ 105-107, Ex. W.**

**<u>Plaintiff's Separate Statement of Facts</u>**

1. Kip was VP of Sales and Capture. **Ex. A ¶ 142, Ex. 3**.

2. The May 28, 2019 commission agreement ("Commission Agreement") governed throughout Kip's employment. **Ex. A ¶¶ 35-91, 273-280, Ex. B 14:20-25, 102:5-105:3, Ex. C. 45:11-46:5, 157: 8-158:3, 160:1-9, Ex. D. 57:3-11, Ex. II, Ex. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.**

3. Kip did not sign any other commission agreement. **Ex. A ¶¶ 35-91, 273-280, Ex. B 14:20-25, 102:5-105:3, Ex. C. 159:7-14, 160:1-9, Ex. D. 57:3-11, Ex. II, Exs. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.**

6. Kip sent many emails to Defendant's management team requesting payment pursuant to the Commission Agreement. **Ex. A. 36**, **Ex. C 121:7-20, Exs. F, G, H, J, K, Q, R, S, T, and CC.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

7. Defendant's management team acknowledged that the Commission Agreement governed the payment of Kip's commissions throughout his employment. **Exs. A ¶ 37, Exs. I, L, N, O, T, AA, DD, EE, FF, HH. Ex. C 160:1-4, Ex. D. 28:8-17, Ex. II.**

8. Defendant's management team discussed changing the terms of the Commission Agreement throughout Kip's employment. **Ex C. 155:1-23, Ex. II, Exs. I, L, DD.**

9. But Defendant never changed the terms of the Commission Agreement. **Ex. A ¶¶ 35-91, 273-280, Ex. B 14:20-25, 102:5-105:3, Ex. C. 45:11-46:5, 160:1-9, Ex. D. 57:3-11, Ex. II, Ex. G-L, N-O, Q-T, AA, DD-FF, HH, Ex. 3.**

10. The Commission Agreement states that Kip is entitled to commissions for "delivering large state and commercial contracts." **Ex. 3, Ex. B 106:5-16.**

11. Nobody told Kip the Commission Agreement was a "discretionary guideline." **Ex. A ¶ 38.**

12. The first time Kip heard anyone claim that the Commission Agreement was merely a "guideline" was during the 30(b)(6) depositions of Maximus. **Ex. A ¶ 39.**

13. The Commission Agreement states that it will remain in place "until terminated or changed by Maximus." **Ex. 3.**

14. The Commission Agreement was a "standalone payment plan . . . that was specific to Mr. Daniels." **Ex. C 31:24-33:1, 122:5-16, Ex. II.**

15. There is nothing in the Commission Agreement that (i) requires Kip to engage in "pre-marketing and client and partner interface" to earn a commission, (ii) limits Kip's right to earn commissions arising from a customer's request for proposal ("RFP"), (iii) grants Defendant the authority to reduce Kip's commissions based on the customer paying less than the contracted amount, (iv) limits Kip's right to a commission for sales based on the modification or extension of an existing contract that results in new revenue, (v) mentions anything about splitting commissions, or (vi) precluding Kip from earning commissions for COVID-related agreements. **Ex. A ¶ 96-100, 131-152, Ex. 3.**

16. Kip was never told that he was precluded from earning a commission (i) arising from an RFP or RFQ, (ii) for COVID-related sales, or (iii) for sales based on the

modification or extension of an existing contract that results in new revenue. **Ex. A ¶¶ 156, 158, 162-167, Ex. D 19:8-16, 25:3-14.**

17. Defendant never told Kip he would have to split commissions or that Defendant could reduce his commission based on the client paying less. **Ex. A ¶¶ 160-61.**

18. The COVID-related opportunities were directed to state agencies. **Ex. A ¶ 134.**

19. The COVID-related sales are "state and commercial" agreements. **Ex. A ¶ 133.**

20. For each COVID-related opportunity, Kip obtained authorization from Naughton. **Ex. A ¶¶162-167 Ex. B 34:23-35:10, Ex. D 13:7-14:19, Ex. II.**

21. Naughton never told Kip that the terms of the Commission Agreement did not apply to any COVID-related sales. **Ex. A ¶ 165.**

22. The first time Kip learned Naughton or anyone else believed the Commission Agreement did not apply to COVID-related sales was during depositions. **Ex. A ¶ 167.**

23. The process for delivering COVID-related sales is largely the same as for worker's compensation, as is the dollar amount of each agreement. **Ex. A ¶ 136.**

24. COVID-related agreements and worker's compensation agreements require having relationships with industry executives, government officials, and advisors. **Ex. A ¶ 138.**

25. The COVID-related agreements were sometimes for smaller amounts than the worker's compensation contracts. **Ex. A ¶ 140, Ex. B 106:2-24.**

26. This meant Kip had to do a similar amount of work to secure the COVID-related agreements for a smaller commission. **Ex. A ¶ 141, Ex. D 16:2-20.**

27. Naughton knew Kip was making COVID-related sales because there were weekly meetings to discuss Kip's sales activity. **Ex. A ¶ 166, Ex. B 30:4-31:6.**

28. Kip delivered many COVID-related agreements. **Ex. A ¶ 307, Ex. W.**

29. Defendant paid Kip for certain agreements consistent with the percentages in the Commission Agreement. **Ex. A ¶ 89, Ex. C 37:10-13, 132:22-133:3, Ex. II, Ex. N, EE.**

30. The parties' course of dealings permitted Defendant to pay commissions by the end of the fiscal year in which they were due. **Ex A. ¶¶ 101-104, Ex. B 26:17-27:5, 27:18-25, 39:5-17, Ex. D 61:6-19.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

31. Defendant "never at one point in time ever honored the payment provisions within the agreement." **Ex. A ¶ 104, Ex. B 60:5-9.**

32. Defendant failed to pay Kip the commissions he was owed by the end of the fiscal year in which they were due. **Ex. A ¶ 168, 194-224.**

33. Defendant failed to provide Kip with a proper accounting, despite his requests. **Ex. A ¶ 169, Ex. B 20:9-14, 26:6-12, 68:21-69:10, Ex. 5.**

34. Even in its NUI responses and Summary Judgment Briefing, Defendant failed to provide a proper accounting. **Ex. B. 26:6-12, Exs. 6, 9, and 15.**

35. Kip created Ex. W, which provides a breakdown for what is owed and when commissions should have been paid. **Ex. A ¶¶ 194-224, Ex. B 20:3-21:3, Ex. W.**

36. For example, Row 14 shows how he should have been paid for the Florida Contact tracing agreement. **Ex. A ¶ 195, Ex. W.**

37. Row 14 Column E shows that the first-year annual contract value ("ACV") for this agreement was $33,723,600. **Ex. A ¶ 196, Ex. W.**

38. Row 14 Column F shows that Kip should have been 6% of the $33,723,600 first-year ACV per the Commission Agreement. **Ex. A ¶ 197, Ex. W.**

39. Row 14 Column G shows that 6% of the first-year ACV results in an "ACV bonus" of $2,023,416. **Ex. A ¶ 198, Ex. W.**

40. Row 14 Column M shows the contract was signed in May 2020 and that the first installment was for $505,854. **Ex. A ¶ 199, Ex. W.**

41. Row 14 Columns P, S, V shows the remaining installments were due August 2020, November 2020, February 2021. **Ex. A ¶ 200, Ex. W.**

42. The Commission Agreement states that commissions are paid in four installments - 25% upon "contract signing" and 25% every 90 days thereafter. **Ex. 3, Ex. B 20:3-21:3.**

43. The commissions for all agreements were required to be paid in four installments over 270 days. **Ex. A ¶¶ 101-104, Ex. B 20:3-21:3, 26:17-27:5, 46:-47:3, Ex. 3.**

44. When a contract was only for 30 to 90 days, the Commission Agreement still required Defendant to pay pursuant to the 270-day installment plan. **Ex. B 66:3-9, Ex. 3.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

45. There is nothing in the Commission Agreement allowing Defendant to pay commissions upfront for agreements executed in FY19-20 and to rely on the $600,000 cap to avoid paying him commissions due in FY20-21. **Ex. A ¶ 126, 26:17-27:5, Ex. 3.**

46. For the Florida Contact tracing agreement, Defendant was required to pay Kip in four installments of $505,853 (25% upon signing in May 2020 and 25% every 90 days - August 2020, November 2020, and February 2021). **Ex. 3, Ex. A ¶¶199-200, Ex. B 26:17-27:5, Ex. W.**

47. Defendant was required to pay the first two installments in FY19-20 and the remaining two installments in FY 20-21. **Ex. A ¶¶ 201-202, Ex. W.**

48. Defendant uses a "quality matrix" to decide what discretionary bonus should be paid above the $600,000 cap. **Ex. C.44:5-15, 45:2-3.**

49. There is no evidence that Defendant used the "quality matrix" or any other system to determine whether to pay above the $600,000 cap. **Ex. A ¶¶ 130.**

50. By June 2022, most agreements in dispute had been executed. **Ex A. ¶ 155.**

51. The Miami-Dade Modification, February 2021 Springfield-Greene County Modification, and August 2021 Springfield-Greene County Modification all resulted in new revenue. **Ex. A ¶¶ 172-193, Exs. N, O, EE.**

52. Kip used his relationships to deliver these agreements. **Ex. A ¶¶ 172-193, Exs. N, O, EE.**

53. The Miami-Dade agreement resulted in Defendant receiving an additional $21,000,000. **Ex. A ¶ 176, Ex. W.**

54. The February 2021 Springfield-Greene County Modification was for $2,697,976, and the Springfield-Greene County Modification February 2021 was for $2,697,976. **Ex. A ¶ 187, Ex. W.**

55. Defendant admitted Kip deserved to be paid for these agreements. **Ex. ¶ 172-193, Exs. N, O.**

56. The Arkansas UI Modification agreement was signed in December 2021. **Ex. A ¶ 225, Ex. W.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

57. The Arkansas UI agreement should have been paid in installments of $26,750 in December 2021, March 2022, June 2022, and September 2022. **Ex. A ¶ 227, Ex. W Row 51, Columns AF, AI, AL, and AO.**

58. Defendant approved payment for Arkansas UI in July 2022, but did not pay Kip anything until March 24, 2023 (six months after filing this lawsuit). **Ex. A ¶ 228.**

59. The Springfield-Greene County COVID Test agreement was signed in January 2022. **Ex. A ¶ 230, Ex. W.**

60. The Springfield-Greene County COVID Test agreement should have been paid in installments of $1,209.60 in January 2022, April 2022, July 2022, and October 2022. **Ex. A ¶ 232, Ex. W Row 56, Columns AG, AJ, AM and AP.**

61. Even though Defendant approved payment in July 2022, Defendant did not pay Kip anything until March 24, 2023 (six months after filing this lawsuit). **Ex. A ¶ 233, Exs. O, EE, 9.**

62. Defendant could not recall if Kip was told about the "new work" requirement before Kip delivered the agreements at issue. **Ex. D 25:10-14, Ex. II.**

63. The "VP of Sales and Capture" includes the "capture" of RFPs and RFQs. **Ex. A ¶¶ 142-43, Ex. B 81:6-82:24.**

64. Defendant paid Kip and Todd Marker a commission for an agreement with South Carolina, which arose from an RFP. **Ex. A ¶ 145-146, Ex. D 42:3-23.**

65. Defendant could not recall whether Kip was told that he was not entitled to commission arising from a RFP <u>before</u> Kip delivered the agreements arising from an RFP. **Ex. A ¶156, Ex. B. 95:20-25, Ex. D 19:8-16, 42:24-43:7, 74:9-17, 85:16-86:25, Ex. II.**

66. Defendant paid Kip commission for North Carolina UI, which arose from a request for quote ("RFQ"). **Ex. A ¶145, Ex. D 41:14-20.**

67. A RFQ is like a less detailed RFP. **Ex. A ¶ 149.**

68. A RFQ and RFP are invitations from a customer to conduct business. **Ex. A ¶ 150.**

69. When an agreement arose from an RFP or RFQ, Kip had to spend significant time working internally with Defendant and speaking with the client. **Ex. A ¶ 151.**

70. Kip had to leverage his relationships. **Ex. A ¶ 152.**

71. Philips investigated whether Defendant properly paid Kip. **Ex.C:126:2-10, Ex. II.**

72. When asked what investigation was conducted, Philips testified, "Yeah, Mr. Naughton was very clear on what qualified as the sales for which Kip was eligible for the bonus and approved the payment. . . . When Kip brought his concerns, right, and he brought -- would coordinate with Tom [Naughton] or when Mr. Daniels brought it to Norman [Iracheta], as you see in the email below, Norman and Kip had a conversation. It will be looked into and -- and, like, if you scroll all the way up, based on the investigation, the BioIQ was paid up. That's the investigation." **Ex. C 126:17-24, 132:6-133:3.**

73. Despite having conducted an alleged investigation, Philips testified that she did not know what criteria was used to determine eligibility for a commission or whether Naughton had spoken with Kip about the criteria. **Ex. C 132:6-133:3.**

74. Kip secured an agreement with Summit One for $3,713,939 in January 2023. **Ex. A ¶ 106, Ex. T, Ex. W E69.**

75. Defendant terminated Kip on March 17, 2023 due to "position elimination." **Ex. Z.**

76. Kip filed this lawsuit on September 1, 2022. **DSOF No. 39.**

77. The lawsuit and summons were served on September 7, 2022. **Ex. E.**

78. Defendant's privilege log reflects that on September 8, 2022, there was a privileged communication concerning Kip's "termination." **Ex. Y, Rows 216, 217, 218.**

79. Defendant described these emails as follows: "Confidential email communication from counsel, requesting information to facilitate the provision of legal advice regarding **<u>termination as part of reorganization</u>**." **Ex. Y, Rows 216, 217, 218.**

80. There were twenty-eight privileged communications between September 8, 2022 and March 17, 2023 concerning Kip's termination. **Ex. Y.**

81. The day before Kip's termination, he reported that Defendant had failed to pay him commissions for the $3,713,399 Summit One agreement. **Ex. B 111:19-24, Ex. R.**

82. The Health Overhead Division was not "re-organized." **Ex. A ¶¶ 254-262, Ex. B 109:19-110:17, Ex. C 79:18-83:9.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

83. Defendant testified there was a "major re-org" "towards the end of the year when Mr. Tom Naughton . . . . decided he want to separate, along with when other senior leaders decided to take retirement this year." **Ex. C 79:18-80:25.**

84. "This year" referred to the 2023 calendar year. **Ex. C 80:20-80:22.**

85. The only thing that occurred in the 2022 calendar year was Naughton's decision to "separate" "towards the end of the [2022] year." **Ex. A ¶265.**

86. On January 19, 2023, Philips sent an email to Iracheta: "Mickey called me and wants you to call Michelle to give her details on Kip's payment and what we are doing with his separation." **Ex. P.**

87. Defendant did not timely pay Kip commission for Summit One, Arkansas UI, or Springfield-Greene County COVID agreements. **Ex. A ¶ 225-233, Exs. Q, R, S, T, CC.**

88. Naughton retired on June 1, 2023. **Ex. C. 29:4-13, Ex. II**.

89. Elizabeth Smith ("Smith") resigned prior to Kip's termination but was replaced by Corinna Dan. **Ex. A ¶ 258-259**.

90. Kip was the only employee terminated due to the alleged reduction in force. **Ex. C. 82:20-83:5, 111:21-24, 153:22-154:9, 160:10-15, Ex. II. Ex. A ¶ 313.**

91. Many of the senior leaders that resigned or retired were not connected to the work Kip was performing. **Ex. A ¶¶ 254-262, Ex. B.109:23-110:6.**

92. Kip could sell any of the services that Defendant provides. **Ex. A ¶ 262.**

93. The ACV of all contracts Kip delivered was a total of $188,134,509.88. **Ex. A ¶ 307, Ex. B 115:13-23, 160:4-18, Ex. W E82.**

94. Several of the agreements Kip delivered extended beyond one year. **Ex. A ¶ 310.**

95. Rob Nydam was the operations manager of the worker's comp independent medical review ("IMR") program. **Ex. B 110:7-10, Ex. A ¶ 260.**

96. Nydam continues to manage the IMR program. **Ex. A ¶ 261.**

97. Kip had no performance issues. **Ex. B. 115:14-16. Ex. A ¶ 312.**

98. Kip was not considered for another position. **Ex. C. 84:6-13, Ex. II.**

99. Defendant did not encourage Kip to apply for another position. **Ex. A ¶ 306.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

100. In May or June 2023, Defendant posted a job for "Regional Vice President, Sales." **Ex. A ¶ 289, Ex. U.**

101. Maximus US Services focuses on state opportunities while Maximus Federal focuses on federal opportunities. **Ex. C 15:22-16:21, Ex. II.**

102. Kip was employed by Maximus Federal, but focused his efforts on state and commercial sales and worked alongside the Maximus US Services teams. **Ex. A ¶ 285.**

103. Maximus Federal also oversaw the worker's compensation programs throughout Kip's employment, even though it was a state opportunity. **Ex. A ¶ 286.**

104. Although Maximus Federal and Maximus US Services are separate entities, they have the same ownership, employment policies and practices, and share the same buildings, systems, and employees. **Ex. A ¶ 287.**

105. According to the job post, Defendant was searching for a candidate who can "[c]onduct opportunity pursuit in health and human services markets," who must have "[e]xtensive knowledge of state government procurement practices, health and human service programs in the region" and "[e]xtensive experience conducting business development activities in state government and health sector." **Ex. A ¶ 291, 292, Ex. U.**

106. These job duties are the same job duties Kip was performing for Defendant, and the job required the same level of responsibility and experience. **Ex. A ¶ 293, 294.**

107. Maximus U.S. Services contacted Kip about an opportunity to join its team shortly after his termination. **Ex. A ¶ 301, Ex. B. 160:19-161:2.**

108. Based on the call, Kip believed Maximus U.S. Services was contacting him concerning the position in the job post marked as Exhibit V. **Ex. A ¶ 302.**

109. After informing Maximus U.S. Services about the lawsuit, Kip never heard back. **Ex. A ¶ 303, Ex. B. 160:19-161:9.**

110. In May or June 2023, Defendant posted a job opening for "VP - U.S Services Business Development" to [c]onduct opportunity pursuit in health and human services markets" in the western region of the US. **Ex. A. ¶ 298-299, Ex.V.**

111. Kip was qualified for both these jobs. **Ex. A ¶¶ 295, 303, Ex. B. 161:10-14.**

DATED this 31st day of May, 2024.

**Silence Law Group PLLC**

/s/Jeffrey Silence_______________
**Jeffrey Silence**
*Attorney for Kip Daniels*

***Certificate of Service***

I hereby certify that on 31st day of May, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alan M. Bayless Feldman
Monica M. Ryden
alan.feldman@jacksonlewis.com
monica.ryden@jacksonlewis.com
Attorneys for Defendant

/s/ Jeffrey Silence_______________

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024