# EXHIBIT A

**SILENCE LAW GROUP, PLLC**
20235 N. Cave Creek Rd., Ste. 104 #460
Phoenix, AZ 85024
Jeffrey A. Silence (029143)
(602) 321-1538
jeff@silencelaw.com

**GAMMAGE & BURNHAM, P.L.C.**
40 North Central Avenue 20th Floor Phoenix, AZ 85004
Gina E. Carrillo (030579)
(602) 256-0566
gcarrillo@gblaw.com
docket@gblaw.com

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kip Daniels,<br><br>Plaintiff,<br><br>v.<br><br>Maximus Federal Services, Inc.,<br><br>Defendant. | Case No. 2:22-cv-01702-SMB.<br><br>**KIP DANIELS' DECLARATION IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**DECLARATION OF KIP DANIELS**

1. I am the Plaintiff in this matter.

2. I am over the age of 18 and make this declaration based upon my own personal knowledge.

**A. Foundation for Plaintiff's Exhibits**

3. For ease of reference, my counsel highlighted the relevant portions of each exhibit.

4. Attached as Exhibit E to my Response to Defendant Maximus Federal Services, Inc.'s ("Defendant") Separate Statement of Facts ("DSOF") and in support of

my Separate Statement of Facts ("PSOF") is a true and correct copy of the certificate of service of the lawsuit on Defendant.

5. Attached as Exhibit F is a true and correct copy of an August 6, 2021 email from me to Thomas Naughton ("Naughton").

6. Attached as Exhibit G is a true and correct copy of a November 23, 2021 email from me to Norman Iracheta ("Iracheta").

7. Attached as Exhibit H is a true and correct copy of a May 2, 2022 email from me to Naughton.

8. Attached as Exhibit I is a true and correct copy of a May 2022 email exchange between Jeena Philips ("Philips"), and Iracheta, and Mickey McDonnell ("McDonnell") that I received through discovery from Defendant.

9. Attached as Exhibit J is a true and correct copy of May and June 2022 emails from me to Naughton.

10. Attached as Exhibit K is a true and correct copy of a June 2022 email exchange between me, Naughton, Iracheta, and Philips.

11. Attached as Exhibit L is a true and correct copy of June 2022 email exchange between McDonnell, Iracheta, and Philips that I received through discovery from Defendant.

12. Attached as Exhibit M is a true and correct copy of June 15, 2022 email Philips to Meera Dunleavy ("Dunleavey), John Heishman ("Heishman"), and Iracheta that I received through discovery from Defendant.

13. Attached as Exhibit N is a true and correct copy of July 2022 email between McDonnell, Dunleavey, Naughton, Iracheta, and Philips that I received through discovery from Defendant.

14. Attached as Exhibit O is a true and correct copy of July 20, 2022 email from Philips to Naughton and Iracheta that I received through discovery from Defendant.

15. Attached as Exhibit P is a true and correct copy of January 19, 2023 email from Philips to Iracheta that I received through discovery from Defendant.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

16. Attached as Exhibit Q is a true and correct copy of February 16, 2023 email from me to Philips, Naughton, and Iracheta.

17. Attached as Exhibit R is a true and correct copy of a January, February, and March 2023 email exchange between myself, Philips, Naughton, and Iracheta that I received through discovery from Defendant.

18. Attached as Exhibit S is a true and correct copy of a March 3, 2023 email from me to Bruce Caswell.

19. Attached as Exhibit T is a true and correct copy of a March 2023 email exchange between me, Philips, Naughton, Iracheta, and Michelle Link ("Link").

20. Attached as Exhibit U is a true and correct copy of a job posting that I obtained from Defendant's website in September 2023.

21. Attached as Exhibit V is a true and correct copy of another job posting that I obtained from Defendant's website in September 2023.

22. Attached as Exhibit W is a true and correct copy of a spreadsheet I created that provides a detailed breakdown for what I am owed and when commission payments were due.

23. Attached as Exhibit X is a true and correct copy of the 2023 proposed Maximus Federal Sales Incentive Plan.

24. Attached as Exhibit Y is a true and correct copy of Defendant's privilege log disclosed in discovery.

25. Attached as Exhibit Z is a true and correct copy of the termination letter dated March 17, 2023 that Defendant sent to me when it terminated me.

26. Attached as Exhibit AA is a true and correct copy of a June 15, 2022 email exchange between Philips, Dunleavy, and Heishman I received through discovery from Defendant.

27. Attached as Exhibit BB is a true and correct copy of a November 2021 and March 2023 email exchange between Philips and Naughton I received through discovery from Defendant.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

28. Attached as Exhibit CC is a true and correct copy of March 14, 2023 Microsoft Teams chat exchange between me and Philips that I received through discovery from Defendant.

29. Attached as Exhibit DD is a true and correct copy of July 12, 2022 email from Philips to Iracheta that I received through discovery from Defendant.

30. Attached as Exhibit EE is a true and correct copy of a December 2022 email exchange between Philips, Iracheta, and Naughton that I received through discovery from Defendant.

31. Attached as Exhibit FF is a true and correct copy of a March 16, 2023 email from Philips to Iracheta that I received through discovery from Defendant.

32. Attached as Exhibit GG is a true and correct copy of a July 14, 2020 "Request for Quote" from North Carolina Department of Commerce that I reviewed while I was employed with Defendant and that I received through discovery from Defendant.

33. Attached as Exhibit HH is a true and correct copy of an email exchange between Naughton and representative for my mortgage lender.

34. Attached as Exhibit II is a true and correct copy of the Notice of Depositions Pursuant to Rule 30(b)(6) that my counsel served on Defendant and used in taking the depositions of the designated representatives.

**B. <u>The Commission Agreement Governed the Payment of Commissions Throughout My Employment.</u>**

35. The May 28, 2019 commission agreement ("Commission Agreement"), governed payment of commissions throughout my employment. **Ex. 3.**

36. I sent numerous emails to Defendant's management team throughout my employment requesting payment pursuant to the Commission Agreement. **Exs. F, G, H, J, K, Q, R, S, T, and CC.**

37. There are numerous emails from Defendant's management team in which Defendant acknowledges (to me and privately amongst each other) that the Commission

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Agreement governed the payment of my commissions. **Exs. I, L, N, T, AA, DD, EE, FF, and HH.**

38. At no time did anyone from Defendant ever inform me that the Commission Agreement was merely a "discretionary" guideline.

39. The first time I ever heard anyone claim that the Commission Agreement was merely a guideline was during Naughton and Philips' 30(b)(6) depositions after I was terminated.

**C. <u>The June 13, 2019 Agreement Has No Relevance.</u>**

40. Without explanation, Defendant includes the June 13, 2019 agreement I signed in its summary judgment briefing. **Ex. 11.**

41. The June 2019 agreement has no relevance. **Ex. 11.**

42. The June 2019 agreement was signed approximately two weeks after I signed the Commission Agreement. **Ex. 11.**

43. The June 2019 agreement contains some restrictive covenants. **Ex. 11.**

44. The June 2019 agreement does not mention or have anything to do with the payment of commissions. **Ex. 11.**

**D. <u>Defendant's Management Team Sent Emails Acknowledging the Commission Agreement Governed Throughout My Employment.</u>**

45. In August 2021, I sent an email to Naughton, which states, "As a follow-up to our discussion in early June, I was able to visit with a few state colleagues and they were presented with a 'COVID' compensation plan in late June. I was advised there were changes to how commissions were to be paid as well as what qualified to be paid under the plan. **<u>To date, I have not received any communications. I would appreciate if Maximus would honor the current compensation plan I was executed upon my arrival or provide me something for my review</u>**. . . ." **Ex. F** (emphasis mine unless otherwise noted).

46. Naughton was the Division President of Defendant during the relevant time.

47. Defendant never asked me to sign a "COVID compensation plan," despite me raising this issue. **Ex. F.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

48. Defendant never told me that my "current compensation plan" was merely a discretionary guideline.

49. In November 2021, I sent an email to Iracheta, which states, "For your reference, **I have attached my offer letter, which is the only compensation plan I have been presented as an employee of Maximus** to avoid any confusion regarding any other plans that may be circling the company. I am requesting the remaining payment of $400,000 in bonuses on 12/3. . . . I love Maximus as an organization and what it stands for and represents and the people I work for and with, but I am extremely disappointed and frustrated I been involved in generating over $125M in prime and sub-contract revenue for the organization over the last 18 months and **I have to draft an email to be compensated per the agreement**." **Ex. G.**

50. Iracheta was the Senior VP of Human Resources for Defendant during the relevant time.

51. Defendant never told me that the "offer letter, which is the only compensation plan I have been presented" was merely a discretionary guideline.

52. In May 2022, I sent an email to Naughton stating that I was owed commissions. **Ex. H.**

53. In that email, I wrote, "With the month of April concluded, I wanted to follow up with you on the payment status of commissions for the 21-22 year as **well as revisit the outstanding commissions I believe I am still owed from the 20-21 year and the terms of my offer letter**." **Ex. H.**

54. I further stated in this email: "I love working for you and Maximus, but the fact it is a hassle to be compensated **based on the terms of my agreement** . . ." **Ex. H.**

55. Defendant never told me that "terms of my agreement" and my "offer letter" were merely a discretionary guideline.

56. In May 2022, Philips sent an email to Iracheta, which states, "**Attached is Kip's offer against which his sales bonus was paid**." **Ex. I.**

57. Philips attached a copy of the Commission Agreement to this email. **Ex. I.**

58. Philips was the Senior Director of HR for Defendant during the relevant time.

59. Philips' email is an acknowledgement that as of May 2022, Defendant had been paying me my "sales bonus amount" pursuant to the Commission Agreement.

60. The term "sales bonus" is the terminology used in the Commission Agreement for commissions. **Ex. 3.**

61. Iracheta responded by sending an email to Philips and McDonnell, which states, "I spoke to Tom Naughton. He agreed that we should flesh out the plan and communication that would go to Kip in moving him to a true Sales Plan. He wants to notify him by July 1 of the FY23 Sales Plan he'd fall under." **Ex. I.**

62. McDonnell is the Senior Manager for Executive Compensation. **Ex. I.**

63. McDonnell responded, "Okay. I'll create a plan that aligns with Simon's teams. To soften the blow and align him with some the other VPs, we could bring him from $200K to $250K in salary." **Ex. I.**

64. This email exchange is an acknowledgement that the terms of the Commission Agreement continued to govern the payment of my commissions.

65. On June 2, 2022, I emailed Naughton to state that I was owed commissions on executed agreements and that commissions on the SFUSD and Missouri UI agreements were due the next day. **Ex. J.**

66. On June 15, 2022, Dunleavy emailed Philips, Heishman, and Iracheta to ask: "What is his sales plan? It wasn't included in Mickey's spreadsheet." **Ex. AA.**

67. Meera Dunleavey was the Senior VP of Finance for Defendant during the relevant time.

68. Philips responded with a screenshot of the Commission Agreement. **Ex. AA.**

69. Philips' email is an acknowledgment that as of June 2022, the Commission Agreement continued to govern payment of my commissions. **Ex. AA.**

70. In June 2022, McDonnell emailed Iracheta and Philips to state, "This is a template of what the rest of the Federal Team is under. I've updated it to reflect FY23 and Tom instead of Simon's title. **<u>This is a pretty drastic difference from Kip's current</u>**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**arrangement**, so there might need to be additional conversation if we want to include tweaks so Kip doesn't immediately walk out the door." **Ex. L.**

71. In July 2022, Philips sent an email to Iracheta, which states, "Norman - I will schedule a meeting with Tom to go over the remaining bonus for 2022 **and then move on to new sales plan for Kip**." **Ex. DD.**

72. This email exchange is yet another acknowledgement that the Commission Agreement remained in effect as of July 2022.

73. In another email from July 2022, McDonnell emailed Dunleavey and Philips: "They're trying to get this approved quickly because we're behind in paying Kip. Do you need any additional information? **I included his offer letter which includes his plan parameters**." **Ex. N.**

74. McDonnell acknowledges in this email that Defendant has not timely paid my commissions pursuant to the "offer letter," which is a reference to the Commission Agreement. **Ex. N.**

75. In this same email exchange, Philips sent an email to, which states, "Tom has approved paying Kip sales bonus for $98,672.097 **as per his offer letter**." **Ex. N, Ex, D 77:23-78:4.**

76. In a separate email from July 2022, Philips wrote the following to me, Naughton, and Iracheta: "BioQ ended in June and the revenue is $1,973,441.94 as of June close. Sales Bonus: **$1,973,441.94 x 5%= $98,672.097**." **Ex. N.**

77. Naughton approved the payment. **Ex. N.**

78. This July 2022 email exchange demonstrates that I was being paid 5% of the ACV consistent with the terms of the Commission Agreement.

79. Philips sent an email to Naughton and Iracheta in July 2022, which states that I deserved to be paid a commission for the Arkansas UI, Springfield-Greene County, and Florida UI agreements. **Ex. O.**

80. In that same email, Philips told Naughton and Iracheta that I was also entitled to be paid for the SFUSD and Missouri agreements once they were signed. **Ex. O.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

81. On March 27, 2023, Philips sent an email to Naughton and Iracheta, which states, "I confirmed with Patrick that work on Summit One Source began at the end of January. Contract is for $3,713,939 and is correct. **As per the offer Kip gets commission at 5% of which 25% is to be paid upon contract signing**." **Ex. T.**

82. In December 2022, Philips wrote to Naughton: "Based on our analysis of the claims made by Kip for his sales bonus **as per his offer letter**, please approve payment of $111,838.40." **Ex. EE.**

83. Philips' email showed that she was asking Naughton to confirm that Defendant should pay Kip 5% of the ACV for the Arkansas UI in February 2022 and Springfield Greene-County COVID January 2022, "as per his offer letter." **Ex. EE.**

84. Naughton approved the payment. **Ex. EE.**

85. Philips then directed Iracheta to make the payment. **Ex. EE.**

86. The email exchange in Exhibit EE is an acknowledgement that the Commission Agreement remained in effect as of December 2022.

87. In March 2023, Philips sent an email to Iracheta, which states, "Kip is asking about 25% for Summit contract **which he is eligible for when the contract is signed**." **Ex. FF.**

88. This email is an acknowledgement that the Commission Agreement remained in effect as of March 2023, which is the month I was terminated.

89. Defendant testified that certain portions of the Commission Agreement were not honored, but "I think what was honored was bonus as a percentage. That was honored. You know, the 2 percent, 5 percent, 5 percent, and the 6 percent." **Ex. C 37:10-13, Ex. II.**

90. Defendant could not identify which provisions of the Commission Agreement were not "honored." **Ex. C 37:14-39:2, Ex. II.**

91. Defendant simply testified that the Commission Agreement was "the template that was used a guideline." **Ex. C 38:24-39:2, Ex. II.**

**E. Defendant Could Have Changed the Terms of the Commission Agreement At Any Time.**

92. Defendant could have changed the terms of the Commission Agreement at any time, with appropriate notice.

93. In some of the emails discussed above, Naughton and others discussed changing the terms of the Commission Agreement. ***See e.g.*** **Exs. I, L, DD.**

94. Despite those discussions, Defendant never changed the terms of the Commission Agreement.

95. It was not until after my termination – when Naughton and Philips were deposed – that I was told about the unwritten terms that Defendant now seeks to enforce.

**F. <u>There is Nothing in the Commission Agreement that Grants Defendant the Unwritten Rights It Claims to Have.</u>**

96. There is nothing in the Commission Agreement that requires me to engage in "pre-marketing and client and partner interface" to earn a commission. **Ex. 3.**

97. There is nothing in the Commission Agreement limiting my contractual right to earn commissions arising from a customer's request for proposal ("RFP"). **Ex. 3.**

98. There is nothing in the Commission Agreement that grants Defendant the authority to reduce my commissions based on the customer paying less than the contracted amount. **Ex. 3.**

99. There is nothing in the Commission Agreement limiting my right to a commission for sales based on the modification or extension of an existing contract that results in new revenue for Defendant. **Ex. 3.**

100. There is nothing in the Commission Agreement that mentions anything about splitting commissions. **Ex. 3.**

**G. <u>The Payment Schedule Was Modified by The Parties' Course of Dealings.</u>**

101. The Commission Agreement required that the commissions be paid in four installments (25% upon signing and 25% every 90 days thereafter). **Ex. 3, Ex. B. 27:18-20, 66:3-9.**

102. This payment schedule meant that commissions were required to be paid over the course of 270 days. **Ex. 3.**



Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

103. Even though the Commission Agreement had a 270-day payment schedule, it was always my understanding from my course of dealings with Defendant that Defendant was not in breach of the Commission Agreement unless the commissions were not paid by the end of the fiscal year in which they were due. ***See* Ex. B 65:5-16.**

104. This was my understanding because Defendant never paid me any of the four installments pursuant to the 270-day quarterly payment schedule, except for the last agreement I delivered (the Summit One agreement).

105. The Summit One agreement was signed in January 2023.

106. Defendant was required to pay me a total first-year ACV bonus of $185,695.95 based on the contract being $3,713,939.

107. Defendant paid me the first installment of $45,637.20 in May 2023 for Summit One, but still owes me at least $140,049.45 and possibly more if Summit One extended the agreement during the first year. This is an example of Defendant selectively applying the provisions of the Commission Agreement that works to its advantage.

108. Also, Naughton told me on several occasions that Defendant would pay me what I was owed for that fiscal year by the end of that fiscal year.

109. Because the commissions were to be paid in four installments over 270 days, one or more of the installments would typically spill over to the following fiscal year. **Ex. C 46:21-47:3.**

110. This meant Maximus was required to make some of the payments within the fiscal year; the remaining payments were required to be made by the end of the following fiscal year in which they were due.

111. In June 2021, I purchased a home.

112. The mortgage lender sent an email to Naughton requesting information about my commissions in May 2021. **Ex. HH.**

113. Naughton sent an email to the mortgage lender stating that "Kip's commissions are paid quarterly." **Ex. HH, *see also* Ex. B 39:5-17.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

114. He further stated, "Kip is in line for commission payments similar to 2020. Payments are scheduled for July, August and September." **Ex. HH.**

115. Naughton's statement that my commission payments would be paid in July, August, and September is consistent with the parties' course of dealings allowing Maximus to pay any commissions due by the end of the fiscal year in which they were due.

116. Naughton's email is also an admission that I should have been paid additional commissions by the end of FY20-21.

**H. Maximus is Using the "$600,000 Cap" to Avoid Paying Hundreds of Thousands of Dollars.**

117. Maximus claims to have paid me all my commissions for the agreements executed in FY19-20 because I was paid the cap of $600,000 in commissions for those agreements in FY19-20.

118. I was paid the cap of $600,000 in commissions for the FY19-20 fiscal year, but as set forth above, the commissions were required to be paid in four installments over 270 days.

119. As a result, one or more of the installments was often required to be paid the following fiscal year. **Ex. B. 26:19-27:5, 27:18-24.**

120. Exhibit W reflects when each of the commissions should have been paid for all the agreements, including those executed in FY19-20.

121. For example, Row 14 Column M reflects that the Florida Contract Tracing agreement was executed in May 2020. **Ex. W.**

122. Row 14 Columns M, P, S, and V reflect that based on the May 2020 execution date, the Florida Contract Tracing agreement was due to be paid in four installments in May 2020, August 2020, November 2020, and February 2021. **Ex. W.**

123. The amount of each installment was $505,854. **Ex. W** Row 14 Columns M, P, and V.

124. Defendant's fiscal year begins October 1 and ends September 30.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

125. This means I should have been paid the first two installments in FY19-20 and the remaining two installments in FY 20-21.

126. There is nothing in the Commission Agreement that allows Defendant to pay me all the commissions upfront for the agreements executed in FY19-20 and to then rely on the $600,000 cap to avoid paying me the commissions that were required to be paid in FY20-21.

127. Defendant's failure to pay me commission in the fiscal year in which they are due is being used to avoid paying me hundreds of thousands of dollars.

128. Defendant also breached the implied duty of good faith and fair dealing by refusing to ever pay me more than $600,000 cap.

129. Defendant testified that Defendant uses a "quality matrix" to decide what discretionary bonus should be paid above the $600,000 cap. **Ex. C 43:22:45:15, Ex. II.**

130. There is no evidence that Defendant ever used the "quality matrix" to decide what discretionary bonus should be paid above the $600,000 cap.

**I. <u>COVID-Related Agreements Are "Large State and Commercial" Agreements.</u>**

131. There is nothing in the Commission Agreement precluding me from earning a commission for COVID-related sales, including unemployment insurance, contact tracing, immunization record review, and COVID testing. **Ex. 3.**

132. The Commission Agreement states that I am entitled to commissions for "delivering large state and commercial contracts." **Ex. 3.**

133. Agreements for unemployment insurance, contact tracing, immunization record review, and COVID testing are "large state and commercial" contracts. **Ex. 3.**

134. Sales for unemployment insurance, contact tracing, immunization record review, and COVID testing are all directed to state agencies.

135. The unemployment insurance, contact tracing, immunization record review, and COVID testing agreements I was asked to deliver are all "state and commercial" agreements.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

136. The sales process for delivering unemployment insurance, contact tracing, immunization record review, and COVID testing agreements is largely the same as for worker's compensation.

137. Unemployment insurance, contact tracing, immunization record review, and COVID testing agreements are generally multi-million-dollar agreements.

138. All these sales require having relationships with industry executives, government officials, and advisors.

139. I worked hard for many years before joining Defendant and while working for Defendant to build connections with industry executives, government officials, and advisors that allowed me to deliver these sales.

140. If anything, the COVID-related sales were sometimes for smaller amounts than the worker's compensation contracts.

141. This meant that in many cases, I had to do a similar amount of work to secure agreements that resulted in a smaller commission.

**J. <u>Defendant Paid Me for Agreements that Arose from an RFP and RFQ.</u>**

142. My position for Defendant was "VP of Sales and Capture."

143. The "Capture" in my job title includes the "capture" of requests for proposals that clients submit to various portals. **Ex. B 81:18-82:2.**

144. Defendant claims that I am not entitled to a commission from any agreement that arose from an RFP.

145. Defendant paid me a commission for the North Carolina UI agreement, which arose from a "Request for Quote" ("RFQ"). **Ex. GG, Ex. D 42:6-23, Ex. II.**

146. Todd Marker was also paid a commission for the North Carolina UI agreement. **Ex. D 42:6-23, Ex. II.**

147. I was also paid a commission for an agreement with South Carolina, which arose from an RFP.

148. A RFQ is very similar to an RFP.

149. The only difference is that a RFQ is generally less detailed.

150. An RFP and RFQ are both invitations from a customer to potentially conduct business together.

151. Even when the agreement arose from an RFP or RFQ, I still had to spend significant time working internally with Maximus and speaking with the client to deliver the agreement.

152. Even when the agreement arose from an RFP or RFQ, I still had to leverage my relationships to establish trust and build rapport.

**K. <u>I Was Never Told About the Unwritten Terms Defendant Seeks to Enforce.</u>**

153. It was not until June 2022 that Naughton suggested I may have been required to engage in "pre-marketing and client and partner interface" to earn a commission. **Ex. K.**

154. When Naughton made this suggestion in his June 2022 email, the SFUSD agreement had already been signed, and the Missouri agreement had been awarded but not yet signed. **Ex. K.**

155. By June 2022, most of the agreements at issue had already been executed.

156. Nobody ever told me that I was precluded from earning a commission arising from a RFP. ***See* Ex. B 81:22-82:2.**

157. Nobody ever told me that the Commission Agreement precluded me from earning a commission for COVID-related sales, including unemployment insurance, contact tracing, and COVID testing.

158. Nobody ever told me that I was precluded from earning a commission for sales based on the modification or extension of an existing contract when the modification/extension results in millions of dollars in new revenue for Defendant.

159. Nobody ever told me that Defendant could pay all four of the installments upfront and then use the $600,000 cap to avoid paying the commissions that were required to be paid the following fiscal year.

160. Nobody ever told me that I would have to split commissions.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

161. Nobody ever told me that Defendant had the authority to reduce my commissions based on the client paying less than the contracted amount during the first year.

**L. <u>Naughton Gave Me Authority to Sell COVID-Related Agreements.</u>**

162. When I was hired, I was directed to connect with state agencies to deliver worker's compensation agreements.

163. I delivered a worker's compensation agreement with New Mexico.

164. In March 2020, Naughton gave me authority to sell each of the COVID-related agreements. **DSOF ¶ 17** ("In March 2020, Maximus began working with government agencies at the federal, state, and local level to assist with the COVID-19 pandemic response and, with permission from Tom Naughton, Plaintiff used his developing relationships with Maximus' business consultants and lobbyist toward this end. This work include providing unemployment claims assistance, in states such as North Carolina and Arkansas, providing testing results and conducting contact tracing."). ***See also* Ex. B 34:23-35:10, Ex. D 13:7-14:19, 30:20-24.**

165. Naughton never told me that the terms of the Commission Agreement did not apply to any COVID-related sales. ***See* Ex. D. 61:8-19, Ex. II.**

166. Naughton knew that I was spending all my time trying to make COVID-related sales because we had weekly meetings to discuss my sales activity. **Ex. B 30:30:4-31:6.**

167. The first time I learned that Naughton or anyone else believed the Commission Agreement did not apply to COVID-related sales was during Defendant's depositions after my termination.

**M. <u>Defendant Violated the Terms of the Commission Agreement.</u>**

168. Defendant breached the Commission Agreement by failing to pay me pursuant to the Commission Agreement, including the parties' course of dealings that permitted Maximus to pay any commissions owed for each fiscal year by the end of the fiscal year in which they were due.



Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

169. Defendant breached the implied duty of good faith and fair dealing in the Commission Agreement by failing to provide me with a proper accounting for the commissions it paid, despite numerous requests. ***See* Ex. B 26:6:12, 68:21-69:10.**

170. Even when responding to my Non-Uniform Interrogatories, Defendant did not provide a proper accounting. **Exs. 6, 9, and 15.**

171. Defendant breached the Commission Agreement by paying me in lump sums, without explanation.

**N. <u>The July 2020 Miami-Dade Modification, February 2021 Springfield-Greene County Modification, and August 2021 Springfield-Greene County Modification Resulted in New Revenue.</u>**

172. The July 2020 Miami-Dade Modification, February 2021 Springfield-Greene County Modification, and August 2021 Springfield-Greene County Modification resulted in millions of dollars in new revenue for Defendant. **Exs. M, W.**

173. As for the Miami Dade agreement, I executed an agreement with the state of Florida in May of 2020.

174. Shortly thereafter, Miami-Dade County wanted to set-up their own contact tracing for the county.

175. Rather than execute a separate agreement, I worked to modify the existing Florida agreement to include providing dedicated contact tracing for Miami-Dade County.

176. The agreement with Miami Dade was later extended, resulting in Defendant receiving an additional $21 million dollars. **Ex. W.**

177. I spent time a significant amount of time with Miami Dade County officials to get the agreement executed.

178. I leveraged my relationship with the local consultant, Jorge Chamizo, to ensure the County was happy with our services.

179. Once the state of Florida stopped providing funding for contact tracing, the agreement was terminated.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

180. As for Springfield-Greene County, an original agreement was executed in the fall of 2020 without my involvement.

181. However, later in the fall/winter, I was the lead on a response to a State of Missouri contact tracing RFP.

182. During that process, I began to develop a relationship with Katie Towns at Springfield-Greene County.

183. I worked with Ms. Towns to modify the existing agreement to include additional scopes of work.

184. My signature is on the scope of work for all the modifications.

185. Philips stated in her July 8, 2022 email that "Arkansas UI, Springfield-Greene County and Florida UI are existing contracts into which **new work was awarded**." **Ex. N, *see also* Ex. M.**

186. Philips stated in her July 20, 2022 email that I was required to be paid for all these agreements. **Ex. O.**

187. Specifically, she stated that I was required to be paid for the Arkansas UI agreement for $2,140,000, Springfield Greene County vaccine agreement for $1,333,296, the Springfield Greene County COVID testing agreement for $241,920, and the Florida UI agreement for $4,567,953. **Ex. O.**

188. But for some reason, Defendant never paid me for the $4,567,953 Florida UI agreement or the $1,333,296 Springfield Greene County vaccine agreement.

189. Even though Philips admitted in her July 2022 emails that I was required to be paid for the Arkansas UI and Springfield Greene County COVID testing agreement for $241,920, Defendant drug its feet in paying for these agreements.

190. It was not until December 2022 that the Arkansas UI and Springfield Greene County COVID testing agreement for $241,920 were discussed again. **Ex. EE.**

191. Naughton approved payment for these payments in December 2022, but Defendant did not pay me anything until March 2023 for these agreements after I had been terminated.

192. I maintained communication with Ms. Towns to make sure she was happy and to share the things we were doing.

193. I spent hours drafting documents and meeting with the clients and Maximus stakeholders.

**O. <u>Exhibit W is a Spreadsheet I Created that Shows What I Am Owed and When the Commission Should Have Been Paid.</u>**

194. Exhibit W is a spreadsheet I created that provides a detailed breakdown for what I am owed.

195. For example, Row 14 shows how I should have been paid for the Florida Contact tracing agreement. **Ex. W.**

196. Row 14 Column E shows that the first-year annual contract value "ACV" for this agreement was $33,723,600. **Ex. W.**

197. Row 14 Column F shows I should have been 6% of the $33,723,600 first-year ACV. **Ex. W.**

198. Row 14 Column G shows that 6% of the first-year ACV results in an "ACV bonus" of $2,023,416. **Ex. W.**

199. Row 14 Column M shows the contract was signed in May 2020 and that the first installment was for $505,854. **Ex. W.**

200. Row 14 Columns P, S, V shows the remaining installments were due August 2020, November 2020, February 2021. **Ex. W.**

201. Pursuant to the Commission Agreement and the parties' course of dealings requiring Defendant to pay all commissions owed for a fiscal year by the end of that fiscal year, the first two installments were due by the end of FY19-20. **Exs. 3 and W.**

202. The remaining two installments were not due until the end of FY20-21. **Ex. W.**

203. Row 22 Column G reflects that the total ACV Bonus for all contracts signed in the FY19-20 fiscal year was $9,394,230.73. **Ex. W.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

204. Row 22 Column H reflects that $4,327,319.77 of the $9,394,230.73 was required to be paid by the end of FY19-20, subject to the $600,000 cap for which Defendant could exercise its discretion to exceed. **Ex. W.**

205. Row 22 Column I reflects that the remaining $5,066,910.96 was due to be paid by the end of FY 20-21. **Ex. W.**

206. Row 42 Column G shows that the total ACV Bonus based on contracts signed in FY 20-21 was $638,034.71. **Ex. W.**

207. Row 42 Column H reflects that of the total ACV of $638,034.71, $395,497.55 was due to be paid FY20-21. **Ex. W.**

208. Row 42 Column I reflects that $242,537.19 was due to be paid by the end of FY21-22. **Ex. W.**

209. Row 43 Column H reflects the $5,066,910 in commissions that was due to be paid by the end of FY20-21 based on contracts executed in the previous fiscal year. **Ex. W.**

210. Row 44 Column H reflects that I was only paid $200,000 in commission for FY 20-21. **Ex. W.**

211. Row 45 Column H reflects that I am owed $400,000 for FY 20-21. **Ex. W.**

212. Column H Rows 42 and 43 reflect that but for the $600,000 cap, my commission for FY 20-21 would have been $5,462,408.51. **Ex. W.**

213. Row 62 Column G reflects that the total commissions I was owed for all contracts signed (“ACV Bonus”) in FY21-22 was $582,724.45. **Ex. W.**

214. Row 62 Column H reflects that of the $582,724.45 in ACV for contract executed in FY 21-22, $506,985.02 was due to be paid in FY 21-22. **Ex. W.**

215. Row 62 Column I reflects that the remaining $75,739.43 was due to be paid in FY22-23. **Ex. W.**

216. Row 64 Column H reflects that I was paid a total of $210,510.50 in commissions in FY 21-22. **Ex. W.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

217. Row 65 Column H reflects I should have been paid an additional $389,489.50 by the end of FY21-22 (September 30, 2022). **Ex. W.**

218. Row 74 Column H reflects that I should have been paid a minimum of an additional $215,798.88 by the end of FY22-23. **Ex. W.**

219. Row 80 Column H reflects that Maximus failed to pay me a total of at least $1,005,288.38. **Ex. W.**

220. Row 82 Column H reflects that the total first year ACV for the agreements I delivered for Defendant during my employment was approximately **$188,134,509.88**. **Ex. W.**

221. Row 82 Column G reflects that but for the $600,000 cap, I would have earned a total of at least $10,800,686.86 in commissions during my employment. **Ex. W.**

222. Row 82 Column H reflects that Defendant paid me a total of $1,056,148 in commissions during my employment, $600,000 of which was paid during the first fiscal year. **Ex. W.**

223. For the avoidance of doubt, Exhibit W reflects that Defendant failed to pay me for each of the agreements in Column A, except that Defendant paid me for the three agreements in FY21-22 that are highlighted in green (Arkansas UI Modification, BioIQ, and Springfield-Greene County COVID Testing).

224. Although Defendant paid me for these agreements, Defendant failed to **timely** pay me for the Arkansas UI Modification and Springfield-Greene County COVID Testing agreements.

**P. Defendant Failed to Timely Pay Me for the Arkansas UI Modification Agreement.**

225. The Arkansas UI Modification agreement was signed in December 2021. **Ex. W.**

226. Defendant paid me a commission of $107,000 for the Arkansas UI Modification agreement on March 24, 2023.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

227. The Arkansas UI agreement should have been paid in installments of $26,750 in December 2021, March 2022, June 2022, and September 2022. **Ex. W Row 51, Columns AF, AI, AL, and AO.**

228. Even though Defendant approved payment in July 2022, Defendant did not pay me anything until March 24, 2023 (six months after filing this lawsuit). **Exs. 9, O, EE.**

229. On March 14, 2023, Philips sent an email to me, which states "I know that based on the lawsuit some reconciliation is going on." **Ex. CC.**

**Q. <u>Defendant Failed to Timely Pay Me for the Springfield-Greene County COVID Test Agreement.</u>**

230. The Springfield-Greene County COVID Test agreement was signed in January 2022. **Ex. W.**

231. Defendant paid me a commission of $4,838.40 for the Arkansas UI Modification agreement on March 24, 2023.

232. The Springfield-Greene County COVID Test agreement should have been paid in installments of $1,209.60 in January 2022, April 2022, July 2022, and October 2022. **Ex. W Row 56, Columns AG, AJ, AM and AP.**

233. Even though Defendant approved payment in July 2022, Defendant did not pay me anything until March 24, 2023 (six months after filing this lawsuit). **Exs. 9, O, EE.**

**R. <u>Defendant Did Not Conduct A Proper Investigation into Whether I Had Been Paid Correctly.</u>**

234. Defendant testified that Philips investigated whether Naughton and Philips had properly paid Kip. **Ex. C 126:1-127:8, Ex. II.**

235. When asked what investigation was conducted, Philips testified, "Yeah, Mr. Naughton was very clear on what qualified as the sales for which Kip was eligible for the bonus and approved the payment. . . . When Kip brought his concerns, right, and he

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

brought -- would coordinate with Tom [Naughton] or when Mr. Daniels brought it to Norman [Iracheta], as you see in the email below, Norman and Kip had a conversation. It will be looked into and -- and, like, if you scroll all the way up, based on the investigation, the BioIQ was paid up. That's the investigation." **Ex. C 126:1-127:8, Ex. II.**

**S. <u>I was Terminated Because I Told Defendant's Management Team – Verbally, Via Email, and By Filing This Lawsuit – That Defendant Failed to Pay Me Commissions in Violation of Arizona's Wage Laws.</u>**

236. Maximus terminated my employment on March 17, 2023 due to a "position elimination." **Ex. Z.**

237. I believe Defendant terminated me because I repeatedly told Defendant's management team – verbally, via email, and by filing this lawsuit – that Defendant failed to pay me commissions, in violation of Arizona wage laws.

**T. <u>Defendant Discussed My Termination with Counsel the Day After Being Served with This Lawsuit.</u>**

238. I filed this lawsuit on September 1, 2022. **DSOF No. 39.**

239. The lawsuit and summons were served September 7, 2022. **Ex. E.**

240. Entries 216 through 218 of Defendant's privilege log reflects that on September 8, 2022 **<u>(one day after being served with the lawsuit),</u>** Defendant exchanged three privileged communications concerning my termination. **Ex. Y**

241. Entries 216 through 218 are highlighted and have a red box drawn around them for ease of reference.

242. Defendant described these emails as follows in its privilege log: "Confidential email communication from counsel, requesting information to facilitate the provision of legal advice regarding **<u>termination as part of reorganization</u>**." **Ex. Y.**

243. There were several dozen privileged communications between September 8, 2022 and my termination on March 17, 2023 concerning my termination due to the alleged "re-organization." **Ex. Y**.

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

### U. **Defendant Decided to Terminate Me No Later than January 19, 2023.**

244. On January 19, 2023, Philips sent an email to Iracheta, which states, "Mickey called me and wants you to call Michelle to give her details on Kip's payment and **what we are doing with his separation.**" **Ex. P.**

### V. **Defendant Terminated Me One Day After I Sent an Email Stating that Defendant Had Failed to Pay Me.**

245. On February 16, 2023, I sent an email stating that Maximus had failed to pay my commissions for the Summit One agreement "based on my original compensation plan." **Ex. Q.**

246. In my February 16, 2023 email, I wrote: "The fact it has taken Finance over two weeks to calculate my bonus/commission **based on my original compensation plan** is concerning and the fact I have had to follow-up to the extent I have had to is very frustrating as an employee who generates revenue on behalf of Maximus." **Ex. R.**

247. On March 3, 2023, I sent an email to Bruce Caswell, Defendant's CEO, which states, "I hope this note finds you doing well. **I am writing to express serious concerns about the company's repeated failure to pay me my wages**." **Ex. S.**

248. In my March 3, 2023 email, I explained that "The company has also failed to explain why I have not been paid for this agreement (or many other agreements at issue). **My Offer Letter, a copy of which is attached, states that I am to be compensated accordingly** . . ." **Ex. S.**

249. I further wrote, "I cannot continue working without being paid. This is not a isolated instance. I am currently in litigation against Maximus for unpaid wages. In my role as a Business Development representative, I have brought in approximately $200M in awarded first year revenue since I joined Maximus in July 2019. I have not been paid for a significant number of the deals in which I was involved." **Ex. S.**

250. On March 14, 2023, I followed up with Philips about getting paid on Summit One, which was executed in FY22-23. **Ex. CC.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

251. Philips responded that she was unable to provide an update, but Iracheta could "maybe" provide an update. **Ex. CC.**

252. On March 16, 2023, I sent a follow up email stating that Maximus had failed to pay me for Summit One. **Ex. R.**

253. I was terminated the next day on March 17, 2023, allegedly due to a "position elimination." **Ex. Z.**

**W. <u>The Health Overhead Division Was Not "Re-Organized."</u>**

254. The Health Overhead Division was not "re-organized."

255. Defendant has not produced any documents to show that the Health Division underwent a "major re-org."

256. Defendant has not explained what "major re-org" occurred, except to say that some of the top leaders separated their employment.

257. Defendant did not address whether the leaders were replaced.

258. Elizabeth Smith ("Smith") resigned prior to my termination, but her position was not eliminated.

259. Corinna Dan filled Smith's position.

260. Rob Nydam ("Nydam") was the operations manager of the worker's compensation independent medical review program.

261. Nydam continues to manage the worker's compensation independent medical review program.

262. Defendant continues to pursue the same "large state and commercial" agreements outlined in the Commission Agreement, and I could have sold any of the services that Defendant offers.

**X. <u>Defendant Made the Decision to Terminate Me Before Naughton or Anyone Else Announced They Were Separating Their Employment.</u>**

263. Defendant testified that it made the decision to do a "major re-org" "towards the end of the year when Mr. Tom Naughton . . . . decided he want to separate, along with

when other senior leaders decided to take retirement **this year**." **Ex. C 79:18-80:25, Ex. II.**

264. Defendant testified that "this year" referred to the 2022 calendar year. **Ex. C 80:20-81:6, Ex. II.**

265. The only thing that occurred in the 2022 calendar year that could support the alleged need for a "major re-org" was Naughton deciding he wanted "to separate."

266. Defendant has not supplied any documentation showing when Naughton first disclosed that he wanted to separate his employment.

267. Defendant testified that Naughton informed Defendant he wanted to "separate . . . towards the end of the [2022] year." **Ex. C 80:20-80:22, Ex. II.**

268. Defendant testified that the discussions about a possible re-organization began in **December 2022**, and Defendant's SOF ¶ 42 states that re-organization began in 2023. **Ex. C 86:6-12, Ex. II.**

269. But Defendant's privilege log reflects that the discussions about terminating me due to an alleged re-organization first occurred on **September 8, 2022**. **Ex. Y.**

270. Naughton continued to work until June 1, 2023. **Ex. C 29:4-13, Ex. II.**

271. Lisa Slaughter continued to work until May 30, 2023. **Ex. C 87:12-13, Ex. II.**

272. Defendant has not explained why I was terminated in March 2023 when Naughton and Slaughter continued to work until May 30 or June 1, 2023.

**Y. I Was Never Directed to Sign the 2023 Federal Sales Incentive Plan Because Defendant Had Already Decided to Terminate Me Prior to October 2022 When This Agreement Took Effect for My Colleagues.**

273. Exhibit X is a draft Sales Incentive Plan that Defendant sent to me in December 2022.

274. Defendant never asked me to sign Exhibit X and never discussed it with me. **Ex. R.**

275. I believe Defendant accidentally sent me this agreement. **Ex. C. 157:23-158:3.**



Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

276. The Sales Incentive Plan states, "**The Plan will be effective starting with Fiscal Year 2023** and supersedes any and all other compensation or commission plans currently in effect for Business Development professionals at the Director, Senior Director, and Vice President level." **Ex. X p. 3.**

277. Defendant's FY22-23 fiscal years begins October 1, 2022.

278. I believe I was never asked to sign this agreement because Defendant made the decision to terminate me in September 2022 after I served the lawsuit.

279. The 2023 Sales Incentive Plan includes some of the terms that were not included in the Commission Agreement, including what is required to earn a commission. **Ex. X p. 5.**

280. But even the 2023 Sales Incentive Plan makes no mention of any of the unwritten terms Defendant seeks to enforce in this lawsuit, including the limitation on payment of commissions on agreements arising from a RFP, RFQ, or request for information ("RFI"). **Ex. X.**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**Z. Maximus US Services Put Out a Job Posting for A Very Similar Position Weeks After I Was Terminated.**

281. Exhibit U is a job posting that I printed from Defendant's website.

282. The job posting was for Maximus US Services. **Ex. U.**

283. Maximus US Services focuses on state opportunities.

284. Maximus Federal focuses on federal opportunities.

285. Even though I was employed by Maximus Federal, I focused all my efforts while employed on securing state and commercial opportunities.

286. Even though worker's compensation is a state opportunity, Maximus Federal oversaw the worker's compensation programs throughout my employment.

287. Although Maximus Federal and Maximus US Services are separate entities, the entities have the same ownership, employment policies and practices, and share the same buildings, systems, and employees.

288. Exhibit U shows at the top left of the first page that I printed it on September 4, 2023.

289. Exhibit U shows that the "posted date" was three months prior to when I printed it in September 2023 (approximately May 2023).

290. The job post was for the position of "Regional Vice President, Sales." **Ex. U.**

291. According to the job post, Defendant was searching for a candidate who can "[c]onduct opportunity pursuit in **<u>health and human services markets</u>**." **Ex. U.**

292. The job post further states that the candidate must have "[e]xtensive knowledge of state government procurement practices, **<u>health and human service programs</u>** in the region" and "[e]xtensive experience conducting business development activities in **<u>state government and health sector</u>**." **Ex. U.**

293. The job duties in Exhibit U are the same job duties I was performing for Defendant.

294. The job described in Exhibit U was a VP level, which was the same level I held during my employment with Defendant.

295. I have all the skills, experience, and connections necessary to fulfill the requirements in Exhibit U.

296. The top left of the first page of Exhibit V shows that I printed this second job post from Defendant's website on September 4, 2023. **Ex. V.**

297. The "posted date" was five months prior, meaning it was posted in or around April 2023. **Ex. V.**

298. The job post was for the position of a VP – U.S. Services Business Development. **Ex. V.**

299. The job post was also seeking a candidate who could "[c]onduct opportunity pursuit in **<u>health and human services markets."</u>** **Ex. V.**

300. The job post further states that the candidate must have "[e]xtensive knowledge of **<u>state government procurement practices, health and human service</u>**

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**programs** in the region" and "[e]xtensive experience conducting business development activities in **state government and health sector**." **Ex. V.**

301. A representative from Maximus U.S. Services contacted me about an opportunity to join her team shortly after my termination.

302. Based on our call, I believe she was contacting me concerning the position in the job post marked as Exhibit V.

303. After I informed the representative about my lawsuit against Defendant, I did not hear anything further about the job opportunity, even though the representative had initially contacted me, and even though I was extremely well qualified for the position.

304. The job described in Exhibit V was for a VP-level position, which was the same level I held during my employment with Defendant.

305. When terminating me, Defendant did not offer me another position.

306. Nor did Defendant even encourage me to apply for another position.

**AA. I was the Only Employee in the Health Services Division that was Terminated Despite Generating Over $188 Million in First-Year ACV During My Employment and Having Zero Performance Issues.**

307. Between May 2019 and March 2023, the first-year annual contract value ("ACV") of the contracts I delivered to Defendant was a total of approximately $188,134,509.88. **Ex. W Row E Column 82.**

308. I doubt many (if any) sales representatives at Defendant sold more than $188 million of first-year ACV during this three-year period.

309. The $1,056,148 that Defendant paid me throughout my employment in commissions is less than 1% of the $188 million in first year ACV that I delivered to Defendant. **Ex. W.**

310. Several of the contracts I delivered for Defendant extended beyond one year.

311. Even if Defendant had paid me the additional $1,005,288.38 in commissions that it owes, the total amount that would be paid in commissions would only be approximately 1% of the total first-year ACV – due to the $600,000 cap that Defendant refused to exercise its discretion to exceed.

312. I had no performance issues during my employment with Defendant.

313. I was the only employee in the Health Services Division who was terminated despite generating a first-year ACV of over $188 million and having zero performance issues.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 31st day of May 2024.

Kip Daniels

Silence Law Group
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kip Daniels, Plaintiff, | ) |
| v. | ) No. 2:22-cv-01702-SMB |
| Maximus Federal Services, Inc., Defendant. | ) |

VIDEOTAPED DEPOSITION OF KIP DANIELS

Phoenix, Arizona

January 10, 2024

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

CERTIFIED TRANSCRIPT

09:56:30 otherwise exist between the three times base cap and what
09:56:34 had been earned during that particular fiscal year.

09:56:37 Q. Okay. All right. So that conversation that we're
09:56:41 talking about with Mark, was that before you signed the
09:56:45 offer letter?

09:56:46 A. Yes, it was.

09:56:48 Q. Okay. And then you signed it and you began work
09:56:50 with Maximus?

09:56:51 A. That is correct.

09:56:52 Q. Did you have any additional conversations with Tom
09:56:56 before you started?

09:56:57 A. I think the only question -- I think Tom had
09:57:02 followed up with me in our first conversation just
09:57:05 reconfirming I didn't have any other questions. I think
09:57:09 the only question I had, you know, for Tom, based on my
09:57:13 prior, I guess, deposition, as you would call it, is, you
09:57:18 know, "How often do they change comission plans?" And his
09:57:23 comment to me was since he had been there, he wasn't aware
09:57:26 of plans changing at all.

09:57:32 Q. Okay. Did you ask him when you would receive a
09:57:35 copy of the compensation plan?

09:57:38 A. To my understanding, that was my compensation
09:57:42 plan: The offer letter/agreement that I had executed. And
09:57:48 was not aware of any other documents at the time that I
09:57:50 would otherwise be required to sign or review.

10:05:26 A. No. Those were the two primary folks that I engaged with.
10:05:31 Q. Okay. All right. Did you have any other conversations with Tom about this particular sale to North Carolina?
10:05:45 A. I don't recall having any other conversations.
10:05:49 Q. Okay. Did you receive any commission or bonus on this sale?
10:05:56 A. During the call, I guess the '19/'20 fiscal year, I did receive a three times base salary bonus of approximately $600,000. However, I never received any type of documentation to indicate whether or not North Carolina or any other deal that we may discuss here this morning was a part of that 600,000 or what percentage or what portion.
10:06:28 Q. Okay. So do you -- do you believe you are still owed a commission on this sale?
10:06:37 A. I believe I'm still eligible for commissions on this particular item that may have otherwise spilled into the next fiscal year based on those installment provisions.
10:06:56 Q. Okay. So I don't know if that answers my question. I think you said you may be eligible. Let me ask you that question first.
10:07:04 A. Okay.
10:07:04 Q. Why do you believe you are eligible for a commission or bonus on this sale?

A. Because the way in which the agreement is, you know, the contract agreement is developed, I am to receive compensation, once again, at the time of the award and every 90 days thereafter.

While there is a three times base cap provision within the document, there is also a provision that indicates that those payments may otherwise fall into the other fiscal year. And so those particular credits as well as future year wins is what obviously compensates you during the next fiscal year.

Q. Okay. And so to -- I understand. Thank you.

So when -- to go back to my question of -- or let me try to restate it.

Do you believe you are eligible for any additional commission or bonus on this sale?

A. If all four installments have not been otherwise paid out, then yes, I do.

Q. Okay. Do you know if all four installments have been paid out?

A. Off the top of my head on this particular agreement, I do not. However, I did put together a document that I believe was also shared with you that indicates, based on the timing and awards of those particular agreements, what the expected payments should have been on those.

10:08:52 Q. Okay.
10:08:52 A. And so if this particular one does fall into the next fiscal year, then the answer would be yes.
10:09:00 Q. All right. Thank you.
10:09:00 And so, again, just to clarify, I think what you're saying and what you said earlier was that you believe you were eligible to receive four installments: One upon signing of the contract and then every 90 days thereafter up to four installments?
10:09:21 A. Correct.
10:09:22 Q. Okay. Thank you.
10:09:25 All right. Do you know if Maximus ever realized any revenue on this work?
10:09:37 A. Yes.
10:09:39 Q. Did they?
10:09:41 A. I would assume they did.
10:09:43 Q. And what's your assumption based on?
10:09:50 A. The fact that the contract, after it was originally executed, involved, for lack of words, an additional scope of work where the state added additional agents on two separate occasions.
10:10:06 Q. Okay.
10:10:10 A. And the fact that, I believe, that program operated well beyond the first year of its annual contract value and I believe at one point in time went before an RFP

Tom about this sale?
A. I don't recall.
Q. All right. And then did you receive a commission or bonus on the DC sale?
A. I believe I answered that question previously.
Q. Okay. And are you referring to when you explained earlier that in the fiscal year 2019/2020, you received three times your salary bonus?
A. Correct.
Q. Okay.
A. Zero documentation of what that $600,000 composed of.
Q. And same question. I'll assume the same answer, but I just need to ask it.
Do you believe you're eligible for an additional commission or bonus on this sale?
A. Once again, if it falls outside the scope of -- sorry.
Once again, yes, if it -- that fourth or third installment does fall into the next fiscal year, then yes, I am eligible for that payment of that.
Q. If Maximus had not waited the 90 days for each payment and paid those in advance, would you still be eligible for bonuses in the next fiscal year that would have otherwise been scheduled?

10:16:40 A. Yes.
10:16:41 Q. Why do you say that?
10:16:44 A. Because the offer letter indicates that there would be credits to the next fiscal year. I was only capped at three times the base salary for that fiscal year.
10:16:56 Q. Okay. So I just want to explore that with you a little bit more.
10:16:59 So if Maximus had paid early and not on the four payment schedule, they would have still owed you if part of that original schedule would have fallen into the next fiscal year; correct? Is that what you're saying?
10:17:21 A. I don't quite understand your question there, if you don't mind repeating or rephrasing.
10:17:26 Q. All right. Well, it sounds like part of this is related to the bonus cap -- right? -- as far as what you're saying you're owed. So I just want to understand -- and we'll look at your spreadsheet in a moment.
10:17:40 But we talked about that you believe, under your offer letter, you should have received four payments?
10:17:52 A. Correct.
10:17:53 Q. Okay. And some of those payments might fall within one fiscal year, and some of those payments might fall within the next fiscal year; correct?
10:18:04 A. That's correct.
10:18:05 Q. So if Maximus had chosen, let's say, for example,

10:20:58 particular week."

10:21:00 So yes, that one I do know because that program was actually run by Federal.

10:21:10 Q. All right. The weekly meetings that you're referring to, can you tell me more about those?

10:21:18 A. Yeah. We would conduct a weekly meeting, especially, you know, during the COVID time because it was very hectic of what was going on.

10:21:31 And so one, you know, we would typically have, you know, operations folks kind of talk about the different opportunities that, you know, were already contracted and, as I mentioned, they were working on. And then I would typically give a report of, you know, different states and kind of where we're at in conversation and potentially, you know, what type of services we may provide them.

10:21:57 Q. All right. How many people typically attended those meetings?

10:22:09 A. I don't have -- I can give you an approximate number, but it would typically be kind of the operation managers and maybe an operational supervisor. So if I had to guess, I'd say five or six or -- of those.

10:22:26 Q. In that range somewhere?

10:22:27 A. Yeah. And obviously, as we got more and more contracts, more and more people joined the call to talk

about kind of what was happening with their program.
Q. Okay. Did Tom Naughton attend those meetings?
A. Yes. He was on the invite list. So sometimes he was there and sometimes he wasn't. As the case with everyone, depending on whether or not there was a conflicting meeting.
Q. Okay. All right. Let's talk about the sale to Arkansas unemployment insurance. So another unemployment insurance matter.
How did you become aware of that opportunity?
A. I had actually reached out to our business consultant there -- and I was trying to think of his name because it's now escaping me -- with regards to, you know, obviously what we had just, you know, accomplished in North Carolina. You know, do you think the state would have, you know, an interest in some type of similar program?
So he set up a meeting with a gentleman by the name of Carter Hawkins, in which I explained to him, you know, what we were doing in North Carolina and, you know, whether or not, you know, he would have an interest in a similar type of program for the State of Arkansas.
Q. All right. And do you remember the name of the business consultant?
A. I know he works for Mullenix & Associates. And I'm drawing a blank on his name.

Wooley.

And Robert had indicated that they did have another agreement in place. However, there were some concerns with perhaps the performance of the other group and that they would be interested in doing a month-to-month agreement with Maximus for us providing contact center support.

Q. So what do you mean when you say a month-to-month agreement?

A. Yeah. So that particular agreement, unlike what I guess I would say is a standard agreement, he was interested in basically doing an agreement that would last approximately 30 days and then, for lack of words, auto renew thereafter.

So it would afford them the ability to, lack of words, I guess, cancel at any time and just say, "Hey, we're not renewing this particular month."

Q. To your recollection, was that different than the other contracts that we've discussed so far?

A. Yeah. The other contracts did have a little bit longer, what I would say, term on them, ranging anywhere from, you know, 90 days to 6 months to, you know, a year.

Q. Okay. All right. Did you discuss the Louisiana opportunity with Tom?

A. Yes.

10:28:45 Q. What did you discuss with him?
10:28:47 A. Once again, whether, you know, I had the
10:28:50 opportunity to pursue it. And then to clarify, you know,
10:28:54 ultimately who would run the program. And it was decided
10:28:56 in that particular case that the federal team could run
10:28:59 that program.
10:29:00 Q. Okay. And so on each of these, you're coming to
10:29:04 Tom to see if you're basically authorized to move forward;
10:29:08 is that correct?
10:29:08 A. That's correct.
10:29:09 Q. And so do you recall any -- and they might not be
10:29:18 what we've talked about already -- but anywhere he did not
10:29:22 authorize them to move forward?
10:29:30 A. I don't recall anything in which, you know, I
10:29:35 wouldn't have been otherwise authorized to move forward.
10:29:38 He ultimately would have said that -- you know, come back
10:29:41 and say, hey, U.S. Services is going to, you know, run
10:29:44 with, you know, that particular, you know, opportunity
10:29:47 based on, you know, whatever reason.
10:29:51 I think maybe an example that would be
10:29:54 somewhat similar to that is I discovered that the State of
10:30:00 South Carolina had produced an RFP for contact center
10:30:06 support for unemployment insurance.
10:30:09 I brought it to him. And he indicated that,
10:30:11 you know, we should probably get U.S. Services involved.

He did so. And he advised that I would be you know, lack of words, you know, paid by the end of the fiscal year.

Q. And what fiscal year was that?

A. So that would be the '19 through '20 fiscal year. So, you know, as we got into, you know, along the similar conversation as we got into, you know, the following year and I had not received any of the subsequent quarterly payments, I once again followed up with Tom, I believe, around late April, May with regards to, once again, just status of where my payments were.

He advised once again at the time that he would, you know, look into it but assured me that I would be made whole by the end of that fiscal year. And I believe he also put that communication in writing to a mortgage lender at the time that was also looking for some additional information with regards to my compensation.

Q. Okay. So the initial conversation you had with Tom about this subject, that was a verbal conversation?

A. Yes. And then I also believe I started to put that particular documentation in writing. I believe I sent an email as well indicating these are the agreements as well.

Q. Okay. The first conversation with Tom -- well, walk me through that.

11:21:00 discretionary bonus at the time, but they elected not to do so. So at least the remaining portion of those three installments would have occurred in the next fiscal year and which otherwise I would be compensated.
11:21:17 But, once again, just like to point out that Maximus never at one point in time ever honored the payment provisions within the agreement. And as I followed up on separate occasions, I was always advised that at least I would be made whole by the end of the fiscal year.
11:21:46 Q. And we'll look at this in a moment. But the offer letter talks about the three times base pay limit; correct?
11:21:52 A. Uh-huh.
11:21:53 Q. Is that a yes?
11:21:54 A. Yes. Sorry.
11:21:55 Q. Just so we get a clear record.
11:21:58 And -- and it says that earned bonus credits that are subject to the three times base pay limit will be tracked on a fiscal year basis.
11:22:11 So my question is: If the three times base pay limit is tracked on a fiscal year basis, how is it that you would get any portion of the bonus in the next fiscal year if you had already reached the cap?
11:22:37 A. So there's two provisions within that document. If I had already reached the cap at that point in time, if you read on one of the lines, I believe there is a

remain in place and the participant is an employee of Maximus."

Q. Okay. So some of the contracts we were talking about earlier you explained had a short term, either 30 days, 60 days, 90 days; correct?

A. That's correct.

Q. So for those types of short-term contracts, would these four installments even apply?

A. Yes.

Q. And why do you say that?

A. Well, my comment back to you is I'm not sure why they wouldn't otherwise apply.

Q. Well, I guess I'm looking at the language that says, "Earned bonuses during a fiscal year will be paid in four installments" and then emphasis on "as long as the contract terms remain in place."

Do you see that language?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. So -- and I guess my question is: If the contract terms are no longer in place because it's a short contract, does this letter address how the bonuses will be paid in that situation?

A. Yes, it does.

11:33:14 In addition, that 25 percent within 180 days and 25 percent within 270 days should still have been made in our example. Is that your position?

11:33:26 A. Yes, that would be my position.

11:33:27 Q. Okay. All right. So you were -- you were starting to explain to me how the annual contract value comes in to play.

11:33:36 A. Correct.

11:33:37 Q. All right. And thank you for holding that thought.

11:33:42 Can you explain to me what -- how that comes in?

11:33:46 A. Well, the annual contract, or otherwise termed as an "ACV," is the term that Maximus utilizes for their agreements.

11:33:59 Q. Okay. And so this is when you were telling me earlier that Maximus did follow the bonus percentage based off the ACV?

11:34:11 A. For at least a portion of the agreements that we can determine from, yes.

11:34:15 Q. Okay. And --

11:34:20 A. As I stated previously, we have no documentation from the '19 through '20 nor the '20 through '21 fiscal year of how bonuses were calculated or paid. I was given a lump sum in each of those particular years.

I believe the Bio IQ agreement was the first agreement -- the Bio IQ agreement was the first agreement where we could illustrate that I was actually paid a certain percentage of the contract in accordance with this document.

Q. All right. And on the other agreements, you're saying you may or may not have been paid a commission; you just don't see the documentation or illustration of that?

A. Yeah. I don't know where they derive their values from.

Q. Okay. The other note I believe we've touched on in our conversation so far is -- forgive me. I think it's note Number 3. And I think this has to deal with the cap; right?

So Note 3 in the template and example says, "Bonuses are paid after the quarter close and total bonuses paid in during a fiscal year are capped at three times the base pay."

Do you see that?

A. Yes.

Q. And so again, three times the base pay would be 600,000; is that right?

A. Yes.

Q. All right. And then there are some subsections to note (a). Can you just read first into the record 3(a).

12:06:36 am I correct, then, that you are not seeking a commission
12:06:38 on this sale since it didn't go through?
12:06:41 A. As long as, you know, no other services result.
12:06:47 But as it exists today, yes, I believe it's dead in the
12:06:51 water.
12:06:53 Q. Okay. Let's move on to the San Francisco Unified
12:06:57 School District sale in, I think, August 2022. Does that
12:07:02 sound right?
12:07:03 A. Yes.
12:07:09 Q. Was this one also an RFP?
12:07:11 A. Yes.
12:07:12 Q. And how did it come to your attention?
12:07:16 A. It was posted on a public website.
12:07:23 Q. And I guess let's still focus on this RFP.
12:07:35 Can you explain to me, you know, why you
12:07:38 believe you're eligible for a commission when it comes in
12:07:42 through an RFP specifically?
12:07:45 A. Well, I guess one is I'll go back to my title,
12:07:48 which is vice president of sales and capture. The
12:07:52 "capture" portion is that -- is that particular aspect of
12:07:56 it.
12:07:57 Furthermore, not at any point in time in my
12:08:00 tenure at Maximus was I ever advised by Tom that any
12:08:08 opportunity that, had I been released of an RFP without
12:08:12 any, quote/unquote -- "prework," I guess, is the term that

12:08:15 he used during his deposition -- that I would not be
12:08:17 eligible.
12:08:18 So in addition, after identifying this
12:08:21 particular opportunity, I brought it before Maximus as part
12:08:26 of their formal review and approval process. That's when
12:08:29 we go after deals like this. And, you know, from, you
12:08:32 know, my standpoint, that formal review and approval
12:08:36 process basically gives the green light to say, "Hey, you
12:08:39 can pursue this particular opportunity."
12:08:41 After we were given approval, I actually
12:08:45 worked with members of the operations team to actually
12:08:48 draft up the response for this particular bid. And
12:08:53 obviously, we were fortunate enough to win the opportunity.
12:08:57 Q. So you pointed out that your title is for sales
12:09:14 and capture?
12:09:15 A. Uh-huh.
12:09:16 Q. Can you explain to me the difference between those
12:09:20 as you understand it?
12:09:22 A. As the way that I understand it, sales, you
12:09:26 basically would, you know, identify, you know, bring in the
12:09:29 opportunity. And then other folks on operations side would
12:09:33 essentially and internally -- would essentially kind of
12:09:36 capture. They write up the proposals and basically send it
12:09:39 on their own.
12:09:40 Obviously, I -- given the fact I came in from

12:30:03 A. Uh-huh. Yes. Sorry.
12:30:05 Q. Okay. And so what is your discussion in these
12:30:08 emails related to that contract? Where was it at at that
12:30:12 time?
12:30:13 A. I was following up on all three with regards to, I
12:30:17 believe, status of payment on these particular awards.
12:30:24 Q. Okay. And so you were asking at this time to make
12:30:28 sure that you were paid on the Bio IQ contract; correct?
12:30:32 A. Correct.
12:30:32 Q. Okay. And how did Tom respond?
12:30:36 A. I don't think Tom ever did respond to me, unless
12:30:47 I'm missing it here in the pages.
12:30:50 Q. If you take a look at --
12:30:52 A. I believe in Tom's deposition or testimony, his
12:30:59 response -- I believe he didn't respond to the first one
12:31:03 because it was already paid out. But in his other two, I
12:31:08 believe -- well, the Missouri one we already talked about.
12:31:11 It was never awarded.
12:31:12 So I guess the only one at issue was the
12:31:15 SFUSD, San Francisco Unified School District. I believe in
12:31:20 his deposition he testified that the reason why it wasn't a
12:31:26 payable commission is because an RFP had been released.
12:31:29 Q. Okay. And you could not recall that he had raised
12:31:35 that as an issue before?
12:31:37 A. Never once.

12:49:11 that correct?
12:49:11 A. I would say that's correct. But as my offer
12:49:14 letter states, I was responsible for obtaining large state
12:49:18 and commercial level agreements, which those COVID-related
12:49:23 opportunities also comprised of.
12:49:25 Q. Okay. But at least at the time that you signed
12:49:27 the offer letter, the idea was that those would be the
12:49:31 workers' compensation programs that we talked about?
12:49:35 A. Sure. But I would also, you know, note that the
12:49:41 agreements that I obtained as a result of, you know, those
12:49:44 COVID-related activities, you know, the amounts of those
12:49:46 agreements would be on par with certainly some of the
12:49:49 examples that were given and also the size of some of the
12:49:53 independent medical review and independent bill review
12:49:55 services that would otherwise have materialized if given
12:49:58 the opportunity to maintain my employment with Maximus.
12:50:01 Q. Can you explain that a little bit more?
12:50:05 A. Well, the values here, I mean, if you look at the
12:50:08 values that I -- the contracts that I obtained as a result
12:50:15 of COVID, if we were to do a -- call it an apples-to-apples
12:50:22 comparison of what a state might otherwise generate for,
12:50:25 you know, some of the services outlined in the offer
12:50:28 letter, you know, those amounts would be, you know, very
12:50:31 similar or on par with one another.
12:50:33 Q. Do you know what the value of the California

13:34:54 the monetary damages you're seeking to recover in this
13:34:58 lawsuit.
13:34:59 We've talked a lot this morning about the
13:35:04 alleged unpaid bonuses or commissions. In addition to
13:35:08 those amounts that we talked about this morning, are there
13:35:10 any other amounts that you're seeking to recover in the
13:35:14 lawsuit?
13:35:14 A. Yes.
13:35:15 Q. Okay. What are -- what are those that you're
13:35:18 seeking?
13:35:19 A. Specifically, wrongful termination as well as the
13:35:26 emotional stress that this is causing me as well.
13:35:30 Q. Okay. All right. So let's talk a little bit
13:35:39 about how your employment with Maximus ended.
13:35:47 That -- your employment ended March 17th,
13:35:50 2023. Does that sound right?
13:35:51 A. Yes. I was terminated then.
13:35:53 Q. Okay. And on -- did you meet with someone?
13:35:57 A. A conference call was scheduled between Tom and
13:36:04 Jeena. And I can't recall if Norman was there or not, but
13:36:09 Tom and Jeena for sure.
13:36:10 Q. And what did they tell you in the conference call?
13:36:15 A. They were -- advised me that I was being
13:36:21 terminated as a result of a reduction in force.
13:36:26 Q. Did they give you any other details about that

13:36:30 reduction in force?
13:36:32 A. That given Tom's retirement is the only really other reason. They referenced a few other employees' retirement. However, those individuals did not work as relates to the workers' compensation services that I was, you know, otherwise tasked to do moving forward.
13:36:59 Q. Okay. Who was tasked with those workers' compensation program services?
13:37:08 A. I believe Rob Nydam is the operations manager of the independent medical review program.
13:37:16 Q. Okay. And so before that meeting, had you heard that Tom was retiring?
13:37:24 A. Yes. Tom had scheduled a call where he announced his retirement.
13:37:30 Q. Okay. And when was that call held?
13:37:35 A. I don't recall. I believe at some point maybe mid February.
13:37:41 Q. And who else was on the call?
13:37:45 A. His entire federal team.
13:37:49 Q. Okay. How large is the team that reports to him?
13:37:55 A. I don't know.
13:37:55 Q. Okay. So he announced his retirement at that meeting to you all. And what did he share about his retirement?
13:38:04 A. I don't recall much of the details. He was fairly

13:38:13 emotional about it, but just indicated that he was
13:38:18 retiring.
13:38:19 Q. Okay. So back to your conference call with Tom
13:38:22 and Jeena. They told you it was a RIF, mentioned some
13:38:28 folks who were retiring.
13:38:31 Did you take any notes during that meeting
13:38:33 with them?
13:38:34 A. I don't recall.
13:38:36 Q. Okay. Did you record the meeting?
13:38:43 A. No. They scheduled the meeting.
13:38:49 Q. My question was: Did you record it as far as,
13:38:51 like, an audio recording?
13:38:52 A. No.
13:38:54 Q. Who communicated the message to you? Was it Tom
13:38:57 or Jeena who took the lead?
13:38:59 A. Tom did a brief commentary, you know, citing, you
13:39:07 know, his retirement and then quickly got off and let Jeena
13:39:12 handle the rest.
13:39:13 Q. Okay. Tell me everything else that was said in
13:39:20 that meeting that you remember.
13:39:24 A. I don't really recall a whole lot. The idea of
13:39:29 being RIF'd at the time when a day prior I was still
13:39:32 complaining about not being paid compensation, it was just,
13:39:35 you know, to me, lip service.
13:39:39 Q. What do you recall about what was said in the

13:43:45 Q. Okay. And do I take it to mean you reserve the right to amend that number?
13:43:50 A. Yes.
13:43:52 Q. So that number is still approximately the same today; is that fair?
13:43:59 A. We'll say approximately, yes.
13:44:01 Q. Okay. What is it based on?
13:44:03 A. It's based on the amount of income I otherwise would have, you know, been owed as part of my salary as part of that termination as well as, you know, once again, the emotional damages that, you know, this particular, you know, termination has brought me in terms of, you know -- you know, the embarrassment, the humiliation of being fired after, you know, generating, you know, $188 million for a company over a three-year period of time with zero performance issues. And the fact that, you know, it's left my, you know, family in some financial issues as a result of their decision to terminate me.
13:44:55 Not to mention the fact that they've appeared to utilize the termination as a means to, you know, not pay out, you know, the Summit One agreement in its "entirement," which is approximately another, you know, 100 to $140,000.
13:45:09 Q. Can you tell me a little bit more about the financial issues this has left your family in?

15:08:31 Q. Do you know whether employees in Arizona have a right to be paid earned wages?
15:08:39 A. Yes.
15:08:40 Q. Do you know whether employees in Arizona are protected from being terminated if they complain about not getting paid wages?
15:08:47 A. I would hope so, yes.
15:08:49 Q. Isn't that what this lawsuit is about?
15:08:51 A. Yes, it is.
15:08:52 Q. And you reported to Maximus many times that you were not being paid correctly?
15:08:59 A. Yes.
15:09:01 Q. Do you believe Maximus intentionally terminated you because of those complaints?
15:09:05 A. Yes. As I outlined earlier, generating $188 million in first-year contract, you know, revenue, I would put that up against anyone in the company over the last three years.
15:09:20 And furthermore, after the RIF, or termination, as you want to describe it, I was actually contacted by an individual from Maximus U.S. operations. And she had heard that I was no longer with the company. And when I advised -- or when she said, you know, "Hey, I've got potentially" -- when I advised her that I'd been RIF'd, she had mentioned that she had potentially had a

position on her team for me given, you know, our work relationship in the past.

I did, obviously, disclose to her that I thought perhaps the reduction in force was part of the fact that I had to sue them, where she had mentioned that it's not the first time that she had heard that Maximus didn't pay their employees but that she would follow up with other personnel internally and see if we couldn't -- obviously, I never heard back from her.

I believe since that point in time, Maximus has actually put out a couple of different jobs that I would have been otherwise more than qualified for, one in the Southwest and two on the West Coast, which is obviously where we reside here. So yeah, I do.

MR. SILENCE: I have no further questions.

MS. RYDEN: One more question. Famous last words. One last question.

FURTHER EXAMINATION

BY MS. RYDEN:

Q. Did any prospective employer tell you that they would not hire you because you were laid off due to a reduction in force?

A. No.

MS. RYDEN: No further questions. We can end

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; that signature was not requested; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 25th day of January, 2024.

Cindy Mahoney

CINDY MAHONEY, RPR, RMR NO. 50680

# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kip Daniels,<br><br>Plaintiff,<br><br>vs.<br><br>Maximus Federal Services, Inc.,<br><br>Defendant. | Case No. 2:22-cv-01702-SMB |

VIDEOCONFERENCE 30(b)(6) DEPOSITION

OF MAXIMUS FEDERAL SERVICES, INC.

JEENA PHILIPS

McLean, Virginia
July 11, 2023
9:02 a.m.

Prepared for:

THE COURT

(Original)

Prepared by:
Herder & Associates
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate Number 50301

In this role, you will report directly to Tom Naughton, Health Division President of Maximus Federal.
Who is Tom Naughton?
A. Tom Naughton heads the business unit called Help under Maximus Federal. Help is a business unit.
Q. Is he still employed with Maximus?
A. No, he's not.
Q. What were his dates of employment?
MS. RYDEN: Objection foundation.
BY MS. CARRILLO:
Q. Do you know the last day of his employment?
A. Has last day was May 30, 2023, or was it -- no, it was 6/1/2023.
Q. Do you know how long he held the position of health division president?
A. I came into the company in 2015. Sometime thereabout.
Q. Do you know why his employment ended?
A. So it was -- Tom had been with the company for a long time and a new general manager joined back in 2021, and Tom decided it was time to move on and he negotiated a separation.
Q. And, as far as organization -- internal organization, was the general manager above Mr. Naughton or up here or below?

Q. You said that Compensation is a part of Maximus Corporate. My question is, is Maximus Corporate the same thing as Maximus Federal Services, Incorporated, or is it a separate entity than Maximus Federal Services?
09:46:29 A. It is a separate segment.
Q. Okay. What do you mean by "segment"?
A. Like, Maximus Federal is a segment of Maximus, Inc., which reports independently.
Q. Okay. Is Maximus U.S. Services also a segment
09:46:51 of Maximus, Inc.?
A. Yes.
Q. Okay. We are going back to Exhibit 1.
It says [as read]: Due to performance expectations of your position, you will be eligible for a
09:47:08 bonus structure that includes two components.
Was this bonus structure specifically for Mr. Daniels or were other employees subject to the bonus structure?
A. This is particularly --
09:47:23 MS. RYDEN: Object- -- sorry, Jeena.
Objection, form. If you just give me a minute to make my objection and then you can answer the question.
All right. Go ahead.
THE WITNESS: This offer letter was prepared
09:47:37 specifically for Mr. Kip Daniels on this position.

BY MS. CARRILLO:
Q. Are other -- are other employees who have the position of vice president of sales and capture also eligible for the bonus structure as described in this offer letter?
MS. RYDEN: Objection, form, and I think this is outside the scope of the topic but, again, we can keep going.
BY MS. CARRILLO:
Q. Well, let me ask you this instead.
Why was Mr. Daniels offered the bonus structure in addition to his base rate of pay?
A. Mr. Daniels was offered a bonus because, usually, when sales professionals start new with a company, they have a ramp up time and they are leaving behind the bonus or the commission they've built up in the previous company. So to help ramp up the sales a transition bonus is given usually during the first year because it usually takes about a year for the sales professionals to build up their pipeline.
Q. Did Maximus offer this transition bonus to other employees beside Mr. Daniels?
MS. RYDEN: Objection, form and foundation, outside the scope of the 30(b)(6) topics.
THE WITNESS: As I mentioned, this offer letter

was specifically developed for Mr. Kip Daniels.
BY MS. CARRILLO:
Q. Who determined the amount of the transition bonus?
09:50:11 A. Mr. Mark Andrekovich.
Q. Do you know how it was calculated?
MS. RYDEN: Objection, form.
THE WITNESS: Mr. Kip Daniels was hired through a search firm. This position was given to a search firm
09:50:50 for sourcing.
BY MS. CARRILLO:
Q. What do you mean by "search firm"?
A. It was called -- if you go into the second exhibit, the one that shows the job description.
09:51:12 Q. On Exhibit 2, are you referring to --
A. Yes. You can stop there, yes.
PrincetonOne is a search firm or the headhunter that was retained to source for this position.
Q. Okay. Where it says here under the note on
09:51:51 Exhibit 1 that says -- kind of trying to highlight it. I don't know if you can read it or not. But it says [as read]: The first year transition bonuses will cease once the earned bonus payment exceed the total transition bonuses allowances amount.
09:52:07 Can you tell me what that sentence means?

10:01:00
10:01:44
10:02:12
10:02:39
10:02:50

so much were dependent on the volume.

Q. I'm sorry. You said so much was dependent on the?

A. On the volume of the business, for example, right? I do not -- it's not an exhaustive list, right? So whether it was on the -- on the volume of the business, that particular contract finally generated.

It was very quick turnaround of those programs. So that is why this template, right, this template, in terms of the way it had to be paid, could not be done. I think what was honored was bonus as a percentage. That was honored. You know, the 2 percent, 5 percent, 5 percent, and the 6 percent.

Q. So which part are you saying of this offer letter changed as a result of the inherent change in Mr. Daniels' position as a result of the COVID-19 pandemic?

MS. RYDEN: Objection, form.

THE WITNESS: Do you want to call out the specifics that you're referring to?

BY MS. CARRILLO:

Q. Yes. I want to know which parts of these agreements changed as a result of everything you just discussed that happened.

MS. RYDEN: Objection, form.

THE WITNESS: I don't want to keep calling back your attention to the line that -- this is a template and an example of how the elements will come together. So this is considered more as a broad outline and a guideline for the bonus to be paid during fiscal years 2020 and 2021, and that was the year when COVID hit, and Maximus businesses focused on the quick turnaround of the COVID program for the government.

And this is where federal -- they focused more on the state COVID programs and -- and, furthermore, because Maximus Federal focuses only on the federal government program, the few state programs, it was U.S. Services that focused on the state programs, and Mr. Daniels was allowed to work on some of the state programs with U.S. Services.

BY MS. CARRILLO:

Q. I just want to make sure I understand what you're saying.

Are you saying that because Mr. Daniels started working with Maximus U.S. Services, that this presented, as you said, template would no longer be applicable to him?

MS. RYDEN: Objection, form.

THE WITNESS: This was the template that was used as a guideline to ensure that Mr. Daniels was paid

for the sales opportunity that he brought in based on the percentages written in this offer letter.

BY MS. CARRILLO:

Q. When you said "based on the percentages in the offer letter," are you referring to the second column where it says "bonuses as percentage of signed contracts"?

A. Yes, I am.

Q. Okay. Would that -- strike that.

Is there a different bonus structure for sales made by individuals, employees who held the same position as Mr. Daniels under the Maximus U.S. Services of segment of Maximus, Incorporated?

MS. RYDEN: Objection, form, foundation, outside the scope of the 30(b)(6).

THE WITNESS: This was a guideline that was used to pay Mr. Kip Daniels the bonus for the sales opportunity that was applicable to him.

BY MS. CARRILLO:

Q. I'm just having a little -- I'm just a little confused as to whether this is applicable to him or not applicable to him as a result of the pandemic, and it appeared to have said both.

Can you explain to me what Maximus's position was as to what his sales bonus program structure was as a result of the changes that came along with his position

THE WITNESS: It is a -- it is a discretion. It is the discretion of the general manager if any other bonus needs to be paid.

BY MS. CARRILLO:

10:18:35 Q. Who has to approve a general manager discretion bonus?

A. So Maximus has what is called a quality matrix which specifies the approvals. So based on the dollar amount of the purpose against the quality matrix, the
10:19:00 approval has to take place.

So, for example, in this case, you know, let's say the general manager or the president recommends and the general manager has the discretion. It can be the CFO. It can be the CHRO, but approval has to be as per
10:19:22 the quality matrix.

Q. Are there any guidelines that Maximus has for managers in determining what, if any, discretionary bonus to give?

MS. RYDEN: Objection, form.

10:19:57 THE WITNESS: As the term "discretion," it is totally discretionary.

BY MS. CARRILLO:

Q. So that probably answers my next question, but are there any policies and procedures that would tell
10:20:14 managers how to calculate any discretionary bonus?

MS. RYDEN: Objection, form.
THE WITNESS: It is a discretion and the final approval is based on a quality matrix.
BY MS. CARRILLO:
10:20:51 Q. Are other positions besides the vice president of sales and capture eligible for a discretionary bonus?
MS. RYDEN: Objection, form, foundation, and outside the scope of the 30(b)(6).
BY MS. CARRILLO:
10:21:38 Q. Yeah, I'll withdraw that question.
I have some questions about the notes at the bottom of this page as well. The first note says [as read]: This program will remain in place until terminated or changed by Maximus.
10:21:53 If the program is terminated or changed by Maximus, is there notice given to employees?
A. If you scroll up, right, if you scroll up on this exhibit -- yeah, yeah, you can stop there. The -- the first compliment is the transition bonus, right, which
10:22:24 is the guaranteed bonus.
Q. Uh-huh.
A. So that, of course, was not changed and was paid.
The second compliment was for the fiscal year
10:22:35 2020 to 2021. So, during this time, if any change was

made or terminated, the employee would be given some kind of a notice that the program is changing.

Q. And who would give the employee notice?

A. The communication would be with, in this case, his manager and the HR via discussion and an email.

Q. And do you know who was -- who was part of the decision to -- I'll strike that.

On Note 2, it says [as read]: The nature of this program is to encourage large deal capture.

I also noted that there is a cap on the amount of commission that's on the third row from the bottom, which is 3X the base pay; is that correct?

MS. RYDEN: Objection, form.

BY MS. CARRILLO:

Q. Well, under this program with -- I'll strike that right now.

Why is the cap 3X base pay?

A. The CHRO would have discussed with the compensation and come up with the -- come up with the cap based upon the base salary that was offered.

Q. And Note 3(b), it says [as read]: The earned bonuses credit -- earned bonuses credits that are subject to the 3X base pay limit will be tracked on a fiscal year basis, but the payments may overlap with future year wins.

What exactly does this sentence mean?

A. To the best of my knowledge, the bonus calculation is done for the fiscal year, but the payment may go into the next fiscal year.
Q. And what does "future year wins" mean?
10:27:07 A. Again, to the best of my knowledge, that the payments for a fiscal year that is overlapping in the future can be paid out together.
Q. Why did Maximus include this Note 3(b) in the offer letter?
10:27:43 MS. RYDEN: Objection, form.
THE WITNESS: I mean, the template and the example broadly captured most of what would be applicable.
BY MS. CARRILLO:
Q. For Note 4, it says [as read]: The employee
10:28:35 must be employed by Maximus at the any bonus is paid; otherwise, all payments would be forfeited.
Are there any exceptions as to this rule?
A. Yes, we follow all state guidelines and rules.
Q. Are there any other exceptions beyond just those
10:29:03 required by state and local guidelines, rules?
A. We run it by our -- through our general counsel and honor the decision of the general counsel when it comes to the placement of an employee.
Q. Okay. How is the annual contract value
10:29:41 determined for a contract?

Q. And who is your immediate manager?
A. As I mentioned, it's about Norman Iracheta.
Q. Did you review any documents to prepare to speak on topic 12?
11:56:41 A. Yes.
Q. What documents did you review?
A. The separation letter and the severance payment.
And I do want to -- on the record, it is not termination. It is a reduction in force, elimination of
11:57:01 the position because of which Mr. Daniels was -- [indiscernible].
THE COURT REPORTER: I'm sorry. What?
THE WITNESS: I would rather call it as why was -- why did Maximus separate Daniels. It was an
11:57:16 elimination of his position.
BY MS. CARRILLO:
Q. Why was his position eliminated?
A. His position was eliminated because the entire health business unit was undergoing total re-org with all
11:57:47 the senior leaders of the health division retiring, resigning, and the general manager's focus was also not to go after the state programs.
Q. I'm sorry. Did you say -- the first part about what the name of the unit was? You said "health
11:58:15 business"?

A. Health business unit under Maximus Federal.
Q. Okay. Is that business unit no longer in existence?
A. Business unit as it existed under Mr. Tom Naughton is no longer in existence.
Q. When did the discussions start to start eliminating the health business unit under Maximus Federal?
A. Can you -- can you repeat the question?
Q. Yeah.
When did the discussion start to eliminate the unit, the health business unit under Maximus Federal?
A. So I want to correct that. The unit has not been eliminated.
Q. Okay.
A. It is undergoing major re-org.
Q. Okay. I'll restate my question then.
When did the discussion regarding reorganizing of the health business unit under Maximus Federal begin?
A. So towards the end of the year when Mr. Tom Naughton, who has been heading the health business unit for long time, decided that he wanted to separate, along with when other senior leaders decided to take retirement who were running the program and there were resignations, so there was a vacuum in the top leadership beginning of

this year.
Q. "This year" being 2023?
A. 2023.
Q. Not the beginning of the Maximus fiscal year, correct?
A. No, that is correct.
Q. Beginning of the calendar year?
A. Calendar year.
Q. How many other members of the top leadership were either retiring or resigning?
A. I do not know the exact, but about five top leaders.
Q. I forget the individual's name, but this occurred after the new general manager for Maximus Federal came in; is that correct?
A. After the new general manager came in, after she settled down, the focus was to grow Maximus Federal with the federal government and not -- and do away with the state business. That was a change in focus.
When the leadership of the health business unit either resigned or retired, that's when the general manager said let's revisit this entire business. What do we want to go after?
Q. And, as a result of that reorganization, Mr. Daniels' position was eliminated?

A. Position was eliminated.
Q. What other positions were eliminated as a result of this health business unit reorganization?
A. So based on the retirement and the resignation, none of those positions had been replaced until the general manager and the other leadership decides how they want to structure the health business unit.
Q. Were any other positions under the top leadership besides Mr. Daniels' position eliminated as part of the reorganization?
MS. RYDEN: Objection, form.
THE WITNESS: As I mentioned, it was in the health business unit where there was senior leadership turnover back to back. That is why the health business unit is being reorganized and revisited and, also, as I mentioned, again, about the focus of the business.
BY MS. CARRILLO:
Q. Correct.
And you mentioned that Mr. Daniels was part of a reduction in force. How many other employees were affected by that reduction in force?
A. All the senior leadership under the health business unit that were responsible for running the program either retired or resigned. The remaining who were there were actually program managers implementing the

program. Mr. Daniels was the only VP for sales and business that was remaining, and Maximus Federal was not going to go after the state businesses. And, because it was in -- under re-org, his was the other -- his was the position that was eliminated.

12:04:17

Q. And so besides him and the top leadership, were any other positions eliminated?

A. There was no other positions remaining to be eliminated.

12:04:34

Q. Okay. Who told Mr. Daniels that he was part of the reduction in force?

A. The meeting took place with Mr. Daniels, with Mr. Tom Naughton, Norman Iracheta, and myself on the call.

Q. And what happened in that call?

12:05:06

A. In that call, Mr. Daniels was communicated that his position is eliminated and he will be provided with the severance as per the Maximus policy.

Q. Were there any other positions at Maximus Federal or even within Maximus -- well, let me strike that.

12:05:31

Were there any other positions within Maximus Federal that were considered to move Mr. Daniels into as an alternative to being subject to the reduction in force?

A. So Mr. Daniels' position specifically was hired to do the independent medical review programs under

12:05:51

refer to Mr. Daniels?
A. Yes.
Q. And is this in reference to the reduction in force that occurred in March of 2023?
12:09:53 A. That is correct.
Q. And, as you mentioned before, I believe, the discussions regarding reorganization began in the beginning of 2023; is that correct?
A. In December when Mr. Tom Naughton asked for his
12:10:12 package.
Q. December 2022, is that the year?
A. Yes.
Q. Yeah. At this time, had Maximus made the determination that Mr. Daniels would be -- his position
12:10:25 would be eliminated as part of the reduction in force?
A. So in December, the pre-leadership that basically managed the program either decided to resign or retire at the same time, and that is when it was decided to revisit this entire business unit and the talks had
12:10:48 started.
Q. I'm sorry. When did you say -- you said that the talks had started at this time; is that correct?
A. Yeah. In December, we had all three senior leaders heading the business unit resign or retire.
12:11:05 Q. Uh-huh.

the contract, and all the details of the work, he was keeping track of these COVID contracts to provide information.

BY MS. CARRILLO:

01:46:56 Q. Was anyone else keeping track of the COVID contracts to provide information?

A. Based on the offer letter, right, Mr. Daniels had a standalone payment plan, and that's why he was -- he was keeping track of -- I do not know how many other
01:47:34 salespeople were involved with the COVID business, but all the other sales and business development had a sales plan.

Q. What do you mean by "standalone plan"?

A. The Exhibit 1 that you showed, his offer letter --

01:47:52 Q. Uh-huh.

A. -- that was specific to Mr. Daniels, yeah.

Q. Okay.

A. And he was keeping track based on this template.

Q. Who communicated to Mr. Daniels that he needed
01:48:24 to keep track of these sales to communicate that information?

A. Mr. Daniels had to work with his manager, Tom Naughton, to get approval to work on these COVID contracts. So all the dialogue was, primarily, between
01:48:53 Mr. Daniels and Mr. Naughton and the two were working

01:56:29 01:57:23 01:57:38 01:58:02 01:58:25

BY MS. CARRILLO:

Q. Beyond the communications between Mr. Naughton and Mr. Daniels, was there any other investigation conducted into whether Mr. Daniels was owed money for commissions on sales he made during his employment with Maximus?

MS. RYDEN: Objection, form.

THE WITNESS: Yeah, Mr. Naughton was very clear on what qualified as the sales for which Kip was eligible for the bonus and approved the payment.

BY MS. CARRILLO:

Q. All right. And I understand that.

My question is, when Mr. Daniels complained, was there any investigation conducted into whether he was owed any additional commission of payments other than what Mr. Naughton had deemed that he was eligible to receive?

A. When Kip brought his concerns, right, and he brought -- would coordinate with Tom or when Mr. Daniels brought it to Norman, as you see in the email below, Norman and Kip had a conversation. It will be looked into and -- and, like, if you scroll all the way up, based on the investigation, the BioIQ was paid up. That's the investigation. [As read]: As of this morning, neither SFUSD nor Missouri UI contract has been finalized.

And this is dated July 8th. So those were the

kinds of investigations that was done.

Q. Who did the investigation?

A. So, in this particular case, when I spoke to Tom Naughton, he will say, okay, you can speak to -- for example, in this case, it was Patrick McLoughlin, right, and then the contract department if the contract was signed or finalized and, based on that, I will give the information back.

01:58:41

Q. I think I'm going to -- the original email on 5 -- emails 5, 6, and 7 of Exhibit 26, I believe, discuss other sales other than the ones mentioned in the final email. The final email being Springfield-Greene, BioIQ, Arkansas and Florida and Missouri.

01:59:51

Were any of the other sales contracts that were in Mr. Daniels' November 23rd, 2021, email investigated regarding any alleged unpaid commission?

02:00:19

MS. RYDEN: Objection, form.

THE WITNESS: There should be another exhibit where Mr. Naughton approved payment where these contracts were mentioned. So Mr. Tom Naughton reviewed the ones that was not paid out. And that is why on the top, you'll see, specifically those three were called out because those three were not mentioned earlier.

02:01:07

Otherwise, these same -- if you scroll down. Yeah, here's -- I think it's mentioned in there. If you

02:01:43

was between Mr. Daniels and Tom Naughton in terms of what qualified as Kip's sales to earn bonus. So that's why Mr. Naughton is asking these questions to see if the criteria meets Mr. Kip being eligible for this opportunity.

02:09:42

Q. Was the criteria for Mr. Daniels to be eligible to earn commission, was that written down anywhere?

A. I do not know the dialogue that took place between Mr. Daniels and Mr. Naughton in terms of what qualified as for sales and what was required.

02:10:09

Q. Did Mr. Naughton receive any direction from anyone else at Maximus what was qualified and what would be eligible for commission for Mr. Daniels?

A. I do not know.

02:10:51

Q. Was there anything that was -- that you are aware of -- that Maximus is aware of besides the offer letter that communicated to Mr. Daniels what kind of sale was eligible to receive a commission payment?

A. Again, because all this was COVID work, the dialogue would have -- conversations would have taken place between Mr. Daniels and Mr. Naughton.

02:11:15

Q. All right. I understand for the conversation, but was there anything else that was written down that was a communication from Maximus, anybody else, not just Mr. Naughton that would tell Daniels [sic] what sales were

02:11:29

eligible or not eligible for commission?
A. Mr. Daniels was paid based on the template outlined in the offer letter.
Q. On the first email that you read from a little bit before, what was the -- the date on this email, on email 1?
A. July 8, 2022.
Q. All right. And, in that email, it says [as read]: As of this morning, neither SFUSD nor Missouri contract has been finalized.
What does that mean?
A. That the contract has not been signed between Maximus and the -- [indiscernible].
THE COURT REPORTER: And the what?
THE WITNESS: And the client, SFUSD and Missouri UI.
BY MS. CARRILLO:
Q. Once the contract has been signed, does that make Mr. Daniels eligible for commission?
A. My understanding is that COVID, in many cases -- and I do not have specific example -- even when the contract was signed, work did not begin. So work had to begin.
Q. And who told Mr. Daniels that work had to begin in order for him to earn contract [sic] on his sale?

Q. Do you recognize this document?
A. Yes, I do.
Q. And what is it?
A. From me to Norman, dated July 12, 2022. [As read]: Norman, I will schedule a meeting with Tom to go over the remaining bonus for 2022 and then move on to new sales plan for Kip.
Q. When it says the new sales plan for Kip, is this a reference to the sales incentive plan document marked as Exhibit 39?
A. That is correct.
Q. At the time that this email was sent, had the 2023 sales incentive plan already been drafted and finalized?
A. As I mentioned, the sales plan was in place and it is usually just reviewed and tweaked if any updates have been made.
Q. Correct. And had the updates for the 2023 version already been made at the time this email was sent?
A. This was a discussion that I had with Norman and I would have reached out to Mickey to make sure I had the financial plan. This was a discussion I was having with Norman.
Q. And did you have that meeting with Tom that you referred to in this email to discuss the remaining bonuses

are subject to this Federal Sales Incentive Plan?
MS. RYDEN: Objection, form.
THE WITNESS: Do you want to rephrase your question?
03:10:17 BY MS. CARRILLO:
Q. Earlier, did you say that this was a standard plan?
A. A sales incentive plan applicable to sales and business development employees in Maximus Federal.
03:10:32 Q. How many business and development sales employees in Maximus Federal are under this Federal Sales Incentive Plan?
A. I would say about eight.
Q. Do the other employees that receive this plan
03:11:07 typically receive a new plan each year as it's altered and minor updates are made?
A. Since it's dated each year, if any tweaks have to be made, tweaks are made and the date is updated and sent to the employees.
03:11:31 Q. And looking at Maximus 98, what is the effective date on this agreement?
A. 10/1/2022.
Q. When was the Federal Sales Incentive Plan first presented to Mr. Daniels?
03:11:50 MS. RYDEN: Objection, form.

THE WITNESS: So the meeting that I had scheduled was immediately canceled. So, officially, Kip was never presented this plan.

BY MS. CARRILLO:

03:12:44 Q. Why was the meeting canceled?

A. I had copied Norman, and Norman said some more tweaks need to be made, so please cancel it. That was why the meeting was canceled.

Q. When was this meeting originally scheduled for?

03:13:23 A. If I remember correct, the first week of December.

Q. Of which year? I'm sorry to interrupt.

A. 2022.

Q. Who would have been the individual to reschedule that meeting?

03:13:41

A. Since I was coordinating, it would have been me.

Q. And why was that meeting never rescheduled?

A. That was -- that is when I reached out to corporate, Mickey, and he said that he's made the changes but he's waiting for a sign-off.

03:14:15

Q. And who would have been the person at Maximus to sign off?

A. It is the same executive committee team, and I do not know the -- [indiscernible] -- compromises would have to sign off for the distribution.

03:14:34

Q. Okay. On the next page, it says -- okay.
Can you please read what it says under effective date on Maximus 99?
A. I can read it, but I would like to reiterate for the record, this plan was not officially presented to Mr. Kip Daniels and it was not applicable.
Q. Just to clarify, then, is it Maximus's position that this Federal Sales Incentive Plan was not applicable to Mr. Daniels during his employment with Maximus?
A. During the time he was employed for 2023, it was not presented to Mr. Kip Daniels. If you're going to his first exhibit, this plan has to be presented, discussed with Mr. Kip Daniels before it becomes applicable and that did not take place.
Q. Understood.
Why was the Federal Sales Incentive Plan never presented to Mr. Daniels?
A. So Mr. Daniels joined in 2019 and 2020 COVID hit. So 2020 and 2021 was focusing on the COVID contracts. By middle of 2022 is when most of the COVID work stopped coming in and federal was going to refocus back on the business that it focuses on. So that is why this plan was not presented to Mr. Kip Daniels. And if you see his offer letter exhibit, the exhibit said that the template is for FY20 and FY21.

Q. What sales incentive plan was he subjected to or was, I guess, under in fiscal year 2022?
A. The offer letter, the template of the offer letter continued.
03:17:58 Q. And what about for fiscal year 2023?
A. Had his employment continued and this was finalized, this would have been presented going forward.
Q. But it was not, correct?
A. Correct.
03:18:30 Q. Okay. I'm going to ask you a bit about topics 16 and 17 in Exhibit 46 to the deposition. I noticed -- could you read topic 16 for me, please.
A. [As read]: Maximus' answers to the complaint, including which individuals acted on behalf of Maximus to
03:19:30 provide responsive information for its answer.
Q. And what did you do to prepare to give testimony on behalf of Maximus on topic 16?
A. So, based on the complaint, I coordinated doing research and gathering information from several
03:19:53 individuals in Maximus to gather all the facts and compile it, reviewed them to prepare for this.
Q. And who are the individuals within Maximus that you spoke to?
A. Starting with Mr. Tom Naughton, Patrick
03:20:15 McLoughlin, a few people in finance, I mentioned Neera

STATE OF ARIZONA )
)
COUNTY OF MARICOPA )

C E R T I F I C A T E

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206.

Dated this 24th day of July, 2023.



Shelley E.D. Pearce, RPR, CSR, CCR
Certified Reporter
Arizona CCR no. 50301

It is FURTHER CERTIFIED that Herder & Associates, Registered Reporting Firm, has complied with the ethical obligations set forth in ACJA 7-206.

Registered Reporting Firm
Arizona RRF No. R1220

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

KIP DANIELS, Plaintiff,

v.

MAXIMUS FEDERAL SERVICES, INC., Defendant.

No. CV-22-01702-PHX-SMB

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF MAXIMUS FEDERAL SERVICES, INC.

DESIGNEE THOMAS NAUGHTON

Deponent located in Oakton, Virginia

(All parties appeared via videoconference.)

DATE TAKEN: July 13, 2023

REPORTED BY: Nicole A. Bulldis, RPR
AZ No. 50955 | CA No. 14441 | WA No. 3384

here. Right? So as we -- if we look to the job description, Kip was hired to sell independent medical review associated with workers' compensation, right? And that is what -- what he was hired to do, and that is what his offer letter -- the guidelines within that offer letter were framed.

With the advent of COVID, Kip, you know, through my discretion, was given the ability to make sales outside of workers' compensation, independent medical review. And with those sales -- so I'm referencing -- right now, just so we're clear, I'm talking about sales related outside of independent medical review, workers' compensation, and that began in approximately March 2020.

For those sales, you know, he was responsible for identifying opportunities. These are opportunities that are not formal requests for proposals or formal requests for information. They're opportunities within a government agency that could be applicable to services Maximus -- Maximus provided or wants to provide.

He was then required to call me and discuss the opportunity and see if he had the ability or the authority, green light, to attempt to make the sales on these opportunities. And through those discussions, he was either given the go-ahead to attempt to make the

sale or not. And, again, these needed to be opportunities that were not formalized by the states already; that were not already on the street, if you will, as far as formal RFPs or formal RFIs.

Q. So you said that the first thing he would do is identify opportunities. How -- well, let me take a step back for a second.

Prior to March of 2020, was the sales process the same or was it different?

A. It would've been very similar, except the -- because he was focused and authorized to address the workers' compensation independent medical review market, he did not need to call me and say, "I believe we have an opportunity to do IMR in the state of Alaska. I'm going to go do this." Right? He would talk to the -- he would have the authority on his own to begin those conversations with the State. There were no sales of workers' compensation IMR during that time period, so there was no further work associated with any sales.

Q. Why did he have to get the okay to seek those sales opportunities after March 2020?

A. Well, because he was hired to sell IMR workers' compensation services, which is a state market. Maximus has a federal services and a state services. State services has -- had agreed, because of my

forward time frame.

How would Mr. Daniels identify -- go about identifying an opportunity for a sale?

A. You know, he would review, obviously, activity within states. He would review websites; review news activity. Obviously, COVID was a little bit of a news event, and things associated with COVID, so, for example, unemployment insurance became a significant market under COVID because of all the folks who lost jobs, and state agencies began getting swamped with unemployment claims and people calling and seeking assistance. So he identified that need and became aware of certain states and specific states that were looking to contract out to help provide customer services related to folks and unemployment insurance.

And his initial -- he initially identified the State of North Carolina in early April, and I believe the State of Arkansas as well. And then throughout the summer, there was also the State of Louisiana, District of Columbia.

And in line with that, the other activity that did not exist prior to COVID was states and local or county governments contracting out contact-tracing work related to COVID or some COVID-type customer service work. And that would've been an opportunity that he

Q. Yeah.

The RFPs did not offer -- well, let me think.

How -- do you know how the -- that -- the fact that -- do you know how the fact that -- RFPs, the work on those did not earn a commission, how that fact was communicated to Mr. Daniels?

ATTY BAYLESS FELDMAN: Objection. Form.

THE DEPONENT: Kip was informed on opportunities that he would submit whether they were going to be commissioned or not, and he would be given reasons for that. And one of the reasons stated was this was -- this was a formal RFP, no presales work was completed prior to the release of this RFP.

Q. (By Atty Carrillo) Was he informed of that requirement before he did work on the RFP?

A. I don't recall.

(Pause in the proceedings.)

Q. (By Atty Carrillo) Are there any other types of sales that Mr. Daniels may have worked on that do not earn a commission bonus besides these RFP pre-proposal opportunities?

A. There -- on sales opportunities, if it was a sales opportunity that Kip was told he had the authority to make the sale on, he would've been eligible for a commission.

contract, is it eligible for commission?

A. No.

Q. And why not?

A. Because it is just an extension of the existing work. It's not a new sales opportunity. It's not new work for a new client. It's not new work for an existing client.

Q. And how was that communicated to Mr. Daniels?

A. Verbally and through email.

Q. Would this be communicated to him before an addendum or additional work that was in the scope of a sale to an existing client was done?

ATTY BAYLESS FELDMAN: Objection. Form.

THE DEPONENT: I don't recall. You know, he was responsible for submitting his commissions, right? So he was responsible for saying, "I made this sale," and we would review those, and then he would be informed whether it was commissionable or not. And he was also informed, outside of that process, that extensions and add-ons of existing work were not commissionable.

Q. (By Atty Carrillo) But you don't recall that information was communicated to him?

A. I don't recall when. It occurred throughout his tenure.

A. So this agreement was associated with him selling workers' compensation IMR work. And this schedule, this template of a schedule, was a template or a guideline. And I don't -- I don't believe he was paid under this schedule at -- at any time during his tenure.
Q. Okay. When he was moved from doing sales for independent medical review to the work that occurred from March 2020 forward, was he presented with a new template or guidelines for how his commissions would be processed?
A. So he wasn't moved from selling workers' compensation IMR to selling COVID-related opportunities. He asked for permission to sell other opportunities, and, within my discretion, I gave him that permission to work those sales, and he was not given a new or different document associated with that.
Q. When did he ask your permission to start doing those sales?
A. Shortly after COVID began.
Q. Do you remember that conversation?
A. I remember him calling me and saying, "I believe there's going to be a lot of activity associated with unemployment insurance, is this a market we can start to look at?" And I said yes.
(Pause in the proceedings.)

Q. (By Atty Carrillo) Did you ever tell Mr. Daniels that he would not be paid in installments per this template guideline offer letter that he was presented?

A. I don't know. I don't recall. He was instructed that he would be paid when everyone had authorized the payments.

Q. When was he instructed -- instructed that he would be paid after everyone authorized the payments?

A. Throughout his tenure.

Q. Did Mr. Daniels ever have to split a commission with someone?

A. Yes.

Q. When did he have to split a commission?

A. He had to split a commission on the sale of the North Carolina unemployment insurance. I believe he split the commission on some of the other unemployment insurance sales, Pennsylvania for one. And I believe he may have had to split commission on the Florida contact tracing to the best of my memory.

Q. Why was Mr. Daniels -- why did he have to split commissions?

A. These were the state opportunities, again, outside of workers' compensation independent medical review, wherein, through discussions, you know, we said,

commission for -- for that period of time for the year of 2020.

Q. Do you recall how this 50/50 percentage was determined?

A. Through discussions with Chris Mirro.

Q. And then looking down at the -- which I'll assume is the North Carolina COVID UI Call Center, on that line we also have another split commission down here with the same salesperson; is that correct?

A. Correct.

Q. Do you recall any of the conversations around splitting the commission on that sale?

A. Yes.

Q. And what were those conversations?

A. That, again, similar to the DC opportunities, this was a state opportunity that we were collaborating with them and that Mr. Marker was engaged in the sale as well as Mr. Daniels. And, therefore, Mr. Marker was eligible for commission as well.

Q. Do you recall why Mr. Daniels received a greater commission on the sale?

A. He was the initial sales lead on that opportunity.

Q. Okay. And do you recall at what point during the sale it was communicated to Mr. Daniels that he

would be splitting commission on this sale?
A. I don't recall. And, again, it was erroneous as he was getting full payment of the $600,000 for the period in question.
Q. Do you know if it was ever communicated to him in writing?
A. I don't know.
Q. Okay. And then the next sale, it looks like they worked together again, but the commission is switched; is that correct?
A. South Carolina, yes. Mr. Marker was considered the sales lead on that opportunity.
Q. Do you remember why -- I guess you just answered it was because Mr. Marker was the sales lead. Is that why he was the higher percentage of commission?
A. Correct.
Q. Okay. Do you know if it was ever communicated to Mr. Daniels that this sale was subject to a split commission?
A. I don't know. But, again, it was erroneous as Kip was getting the full $600,000 for the period of time in question.
Q. What is the relationship between Maximus US Services and Maximus Federal Services at this time?
ATTY BAYLESS FELDMAN: Object to the

he was hired to sell.

(Pause in the proceedings.)

Q. (By Atty Carrillo) Was Mr. Daniels presented with any other -- well, let me just jump back to Exhibit 1 real quick.

Was Mr. Daniels presented with any other sales bonus program plan other than the one that was presented to him in his offer letter?

A. Mr. Daniels was never formally under any other sales plan other than what -- the template that was placed in the offer letter.

Q. And why was he not under any other sales plan?

A. I don't know the answer to that.

Q. How was the decision -- going back to the Hawaii Adjudication sale, how was the decision made to -- or, how did Mr. Daniels earn commission on that sale?

A. He engaged the client. He presented our -- our capabilities. He worked with -- this was a fully -- going to be a state operations opportunity, so he worked with some of the state folks to help get the sale complete.

Q. And who was the final decision-maker into whether he would earn a commission on this sale?

A. I was.

that you did not use as part of your guideline proceeding forward with Mr. Daniels during his employment?

A. Could you scroll down, please?

Q. Yes.

A. Sorry. I'm stuck on -- can you keep going?

Q. I think that's the end of it.

A. Yeah. There were areas that, you know, we did not use as guidelines.

Q. Can you tell me what those areas were?

A. The -- the timing of payments.

Q. And why did you not use that guideline?

A. Because those guidelines were applicable for sales that he was hired to do, and we were engaged in sales outside of the -- the scope of this.

Q. And when was Mr. Daniels told that those installments and guidelines would not be used for his sales?

A. I don't know.

Q. Do you know if he was told verbally that those guidelines were changing?

A. He was told verbally of the process of getting his sales commissions authorized and completed.

Q. Are there any other parts of this offer letter that were not used as guidelines throughout Mr. Daniels'

Q. (By Atty Carrillo) Who else would've told him that he would have not been eligible on non-commissionables -- or, I'm sorry.
Who would've been the person to tell him that he was not eligible for commission on RFPs?
A. I would've.
Q. Anyone else?
A. No.
Q. Did you ever have a conversation with Mr. Daniels why he was not paid for -- not -- why he did not earn commission on this particular proposal for the Florida Unemployment Insurance?
A. I don't recall.
Q. Prior to Mr. Daniels doing work on the RFP, was he told that he would not be earning commission on that work?
A. I don't recall.
Q. Okay. I'm going to mark this as Exhibit 50. It is EMAILS 1970. It's just this page. I'll slow down with my scrolling a little.
Mr. Naughton, do you recognize this document?
A. I do.
Q. And what is it?
A. It is a series of emails.
Q. And who are the emails between?

A. Speaking with the clients, sending them information about our capabilities, offering them a solution to potential problems they may have.

Q. When Mr. Daniels would work either with an existing client or a new client, was it all the way through to contract signing?

A. Generally, yes.

Q. Who --

A. It was client-specific.

Q. What would be a scenario where he would not work with a client all the way through to signing?

A. In instances where US Services was going to manage the entire contract, then he would hand off his work to them and they would move forward to secure and finalize everything.

Q. Who gave the final authority on Mr. Daniels' earning commission on the Springfield-Greene County COVID tests?

A. I did.

Q. And was he paid in full for the -- his full commission for that sale?

A. Yes.

Q. Okay. Jumping back really quickly to Exhibit 50, Ms. Philips said, "made by Kip for his sales bonus as per his offer letter."

Was the offer letter still being used as a guideline at this point of his employment?
A. Yes. We were still using portions of the offer letter as a guideline.
Q. Okay. I'm going to mark what will be Exhibit 51, which is EMAILS 1864.
Do you recognize this document, Mr. Naughton?
A. Is this the upper email you're referencing?
Q. Yes. I think we went through this bottom one.
A. Correct.
Q. Yeah.
A. Yes, I recognize this copy of emails.
Q. Okay. And can you tell me the date on the email above the one we had reviewed before from Exhibit 50?
A. December 7, 2022.
Q. And who is that email from?
A. Thomas Naughton.
Q. And to?
A. Jeena Philips, and copied to Norman Iracheta.
Q. Okay. And what does that email say?
A. "Approved."
Q. Okay. Do you know why that payment was not made until March of 2023?
ATTY BAYLESS FELDMAN: Objection. Form.

ATTY BAYLESS FELDMAN: Object.
You can answer.
THE DEPONENT: Yes. The -- the proposal was bid by a company, I believe, called Capitol Bridge, and Maximus was the subcontract to Capitol Bridge on that contract. They have never done any work under this contract.
Q. (By Atty Carrillo) When you say "they," do you mean Capitol Bridge?
A. Correct.
Q. Can you tell me what the scope of the original work was supposed to be under this contract?
A. Unemployment customer service work similar to the other unemployment contracts.
(Pause in the proceedings.)
Q. (By Atty Carrillo) Okay. And I think the other one on here is the San Francisco Unified School District. Was Mr. Daniels paid a commission for this sale?
A. No.
Q. And why was he not paid a commission for this sale?
A. It was not a commissionable event.
Q. And why was it not a commissionable event?
A. There was no sales activity prior to a public

RFP being released. I would also add that his commission notification included a budget much larger than was the final budget.

Q. Are you referring here to Exhibit 48?

A. I don't recall what exhibit I'm referring to.

Q. The one that's up on the screen, is this budget number -- I guess, does that reflect a higher budget number or is that the actual budget number?

A. That's the actual budget number.

Q. That's the actual, but what you were saying was that Mr. Daniels submitted a commission for a higher number --

A. Correct.

Q. -- than this?

Okay. If there was sales activity prior to a formal or a public RFP being issued, would that sale be eligible for commission?

ATTY BAYLESS FELDMAN: Objection. Form.

THE DEPONENT: It's opportunity-specific.

Q. (By Atty Carrillo) Okay. So would that be in your discretion?

A. Yes.

Q. When was it communicated to Mr. Daniels that he would not earn commission on the sale?

A. I don't recall.

STATE OF ARIZONA )
) SS
COUNTY OF MARICOPA )

C E R T I F I C A T E

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[ ] Review and signature was requested.
[ ] Review and signature was waived.
[x] Review and signature not discussed.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206.

Dated this 31st day of July 2023 in Phoenix, Arizona.

nicole a. bulldis
NICOLE A. BULLDIS, RPR, CCR
Certified Reporter
Arizona CCR No. 50955

It is FURTHER CERTIFIED that Herder & Associates, Registered Reporting Firm, has complied with the ethical obligations set forth in ACJA 7-206.

______________________________
Registered Reporting Firm
Arizona RRF No. R1145

# EXHIBIT E

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>Jeffrey Alan Silence, Esq<br>JABURG & WILK, P.C<br>3200 N. Central Avenue 20th Floor<br>Phoenix, AZ 85012<br>*TELEPHONE No.:* (602) 248-1000<br>*Attorney for:* Plaintiff<br>*Ref No. or File No.:* 22961-1 | CLERK OF THE SUPERIOR COURT RECEIVED CCB #1 DOCUMENT DEPOSITORY<br>2022 SEP 12 PM 1:52<br>FILED BY: [signature] |
| *Insert name of Court, and Judicial District and Branch Court:*<br>In MARICOPA COUNTY SUPERIOR COURT in and for the County of MARICOPA | |
| *Petitioner:* KIP DANIELS<br>*Respondent:* MAXIMUS FEDERAL SERVICES, INC | |

| **CERTIFICATE OF SERVICE** | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER: CV2022-011561 |
|---|---|---|---|---|

I declare under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct. At the time of service I was at least 21 years of age and authorized to serve process in this case.

I served copies of the SUMMONS; COMPLAINT; CERTIFICATE OF COMPULSORY ARBITRATION

a. Party served MAXIMUS FEDERAL SERVICES, INC, BY SERVICE UPON ITS STATUTORY AGENT, CORPORATION SERVICE COMPANY

b. Person Served Candace Steele - Service of Process Coordinator/Authorized to Accept
Age: 31 - 35 Race: Caucasian Sex: Female Eyes: Height: 5'1 - 5'6 Weight: 100-120 Lbs Hair: Blond

Address where served: 8825 N 23rd Ave Ste 100
Phoenix, AZ 85021-4148

5. I served the party
 a. I personally delivered the documents to the party or person authorized to receive service of process for the party (1) on: 9/7/2022 (2) at: 10:05 AM

Person who served papers:
NATIONWIDE LEGAL
Name: Richard F. Acree
County of Maricopa, MC-5966
3150 North 24th Street, #D104
Phoenix, AZ 85016
(602) 256-9700
www.nationwideasap.com

The fee for service was: $ 75.20

Date: September 8, 2022

[signature]

(Richard F. Acree)

AZ269750

**CERTIFICATE OF SERVICE**

# EXHIBIT F

**Sent:** Saturday, September 11, 2021 9:55 AM
**To:** Naughton, Thomas C <thomasnaughton@maximus.com>
**Subject:** FW: Reconciliation

Tom,

Is there an ETA when my below commissions will be paid?

Thanks,

Kip

**Kip Daniels**
Vice President of Business Development & Capture

**MAXIMUS Federal**
3120 Fairview Park Drive, Suite 400
Falls Church, VA 22042
Phone: 630.229.1236
KipRDaniels@maximus.com

---

**From:** Daniels, Kip R
**Sent:** Friday, August 6, 2021 10:36 AM
**To:** Naughton, Thomas C <thomasnaughton@maximus.com>
**Subject:** FW: Reconciliation

Tom,

As a follow-up to our discussion in early June, I was able to visit with a few state colleagues and they were presented with a "COVID" compensation plan in late June. I was advised there were changes to how commissions were to be paid as well as what qualified to be paid under the plan. To date, I have not received any communications. I would appreciate if Maximus would honor the current compensation plan I was executed upon my arrival or provide me something for my review. Can you advise next steps to be paid on the below agreements to be paid in over the next 60 days?

Hawaii DLIR (Unemployment Insurance)
$2,460,00 X 5% = $123,000 (Sept. '20)
$2,460,000 x 5% = $123,000 (Sept. '20 Addendum to increase agent counts)
$2,730,000 x 5% = $136,500 (Oct. '20 Adjudication)

Total = $382,500

Florida DOH (Contact Tracing)
$6,265,587.00 x 6% = $375,935.22 (Florida DOH May '20…was never compensated for agreement, which states I am eligible for compensation for at minimum October '20 to present)
$27,458,013 x 6% = $1,647,480.78 (Florida DOH May '20…was never compensated for agreement, which states I am eligible for compensation for at minimum October '20 to present)
$13,892,604 x 6% = $831,756.24 (Miami-Dade July '20…was never compensated for agreement, which states I am eligible for compensation for at minimum October '20 to present)
$7,213,102 x 6% = $432,786.12 (Miami-Dade Extension Dec. '20)

Total = $3,287,958.36

Arkansas Unemployment Insurance
$1,500,000 x 5% x 3 (60 day renewals) = $225,000
$1,043,433 x 5% = $52,171.65 * (work began in October '20)

# EXHIBIT G

Thanks,

Kip

**Kip Daniels**
Vice President of Business Development & Capture

**MAXIMUS Federal**
Remote – Phoenix, Arizona (Eastern Time)
Phone: 630.229.1236
KipRDaniels@maximus.com

---

**From:** Daniels, Kip R
**Sent:** Tuesday, November 23, 2021 2:16 PM
**To:** Iracheta, Norman O <NormanIracheta@maximus.com>
**Subject:** Bonuses
**Importance:** High

Norman,

Thanks for your time, as follow up to our discussion, please note the below:

On Thursday, November 11th I had a conversation with Tom Naughton where he explained I was only being approved for approximately $200,000 in bonuses to be paid on 12/3. For your reference, I have attached my offer letter, which is the only compensation plan I have been presented as an employee of Maximus to avoid any confusion regarding any other plans that may be circling the company. I am requesting the remaining payment of $400,000 in bonuses on 12/3 plus an explanation why I was never paid/considered for any General Manager Discretionary Bonus or Long-Term Equity Program for either 2019-20 or 2020-21.

While attached, below is a summary of payment of bonuses as well as Long-Term Equity Program in my offer letter:

*3. Bonuses are paid after the quarter close and total bonuses "paid" during a fiscal year are capped at 3X base pay*

*a. If the bonus calculation exceed 3X base pay, the General Manager may use discretion to make additional payments*
*b. Earned bonus "credits" that are subject to the 3X base pay limit will be tracked on a fiscal year basis, but the payments may overlap with future year wins*

*4. The employee must be employed by Maximus the time any bonus is paid. Otherwise, all payments will be forfeited.*
*5. Contract values are determined by Annual Contract Value (ACV)*
*6. Earned bonuses during a fiscal year will be paid in four installments as long as the contract terms remain in place and the participant is an employee of Maximus:*
*25% on contract signing*
*25% within 90 days*
*25% within 180 days*
*25% within 270 days of signing*

*Long-Term Equity Program: Maximus maintains discretionary Long-Term Equity Program that is based on individual performance and value added to the Company. All awards subject to Board*

*of Directors approval and the terms of the Maximus Equity Plan. While there are no guarantees, you will be eligible for consideration during the November 2020 award cycle.*

In August 2020, I submitted the below (along with supporting documentation) for payment of bonuses and received communications that I would be paid $600,000 (3X base pay) with $325,000 coming from Federal and $275,000 coming from US Services based on the fact US Services was running North Carolina, Pennsylvania and Florida projects.

1. North Carolina Unemployment Insurance
   - $1,164,658.10 x 5% = $58,232.91 (March '20 – 90 days)
   - $3,499,766.68 x 5% = $174,988.33 (April '20 – 90 days)
   - $13,166,216.64 X 6% = $789,973.00 (April '20 – 90 days)

   Total: $1,023,194.24
   *Please note this agreement was extended through June 2021, with the potential of options years through June 2023.

2. Arkansas Unemployment Insurance
   - $2,000,000 x 5% = $100,000 (May '20 – 90 days)
   - $1,500,000 x 5% = $75,000 (April '20 – 60 days)
   - $1,043,433 x 5% = $52,171.65 * (confirming PO) (June '20 – 90 days)

   Total: $175,000 + $52,171.65

3. Louisiana Unemployment Insurance
   - $501,350 x 5 (30 day renewals) x 5% = $125,326.25 (April '20 – 30 days)

   Total: $125,326.25

4. Florida Contact Tracing
   - $6,265,587.00 x 6% = $375,935.22 (May '20 – 30 days)
   - $27,458,013 x 6% = $1,647,480.78 (May '20 – 180 days)
   - $13,892,604 x 6% = $833,566.24 (July '20 – 180 days)

   Total: $2,856,972.24
5. Pennsylvania Unemployment Insurance
   - $3,084,187 x 5% = $154,209.35 (June '20 – 90 days)

   Total: $154,209.35

Based on a review of my offer letter and its structure/language, I am submitting the below for bonuses to be paid for October '20 through September '21 year.

1. Hawaii DLIR (Unemployment Insurance)
   $2,460,00 X 5% = $123,000 (Sept. '20)
   $2,460,000 x 5% = $123,000 (Sept. '20 Addendum to increase agent counts)
   $2,730,000 x 5% = $136,500 (Oct. '20 Adjudication)

   Total = $382,500

2. Florida DOH (Contact Tracing)
   $27,458,013 x 6% / 6 months * 3 months = $823,740.39 (October '20 to December '20)

$13,892,604 x 6% / 6 months * 3 months = $416,778.12 (October to December '20)
$7,213,102 x 6% = $432,786.12 (Dec. '20 – 90 days)

Total = $1,673,304.63

3. <u>Arkansas Unemployment Insurance</u>
$9,000,000 x 5% x = $450,000
$1,043,433 x 5% = $52,171.65 * (work began in October '20)

Total = $450,0000 + $52,171.65

*<u>*Attached is an addendum executed in December '20 that extended our agreement through December '21 for a total of $14M TCV. We are awaiting signature of Amendment #2 that will take us through June 2023 for an additional $2.1M on top of the $14M for a total of $16.1M TCV.*</u>*

4. <u>Louisiana Unemployment Insurance</u>
$5,400,000 x 5% = $270,000
$2,870,357 x 5% = $143,517 (July '21 Adjudication)

Total = $413,517

*<u>*Attached is Amendment #11, which outlined the conclusion of our work in Louisiana for a total of $11.1M in TCV.*</u>*

5. <u>Missouri Green County Contact Tracing</u>
$2,697,976 x 5% = $134,898,80 (Feb. '21)
$2,697,976 x 5% = $134,898.80 (Aug. '21)

Total = $269,797.60

6. <u>Missouri Franklin County Contact Tracing</u>
$365,000 x 2% = $7,300 (Nov. '21)

7. <u>Missouri Cape Girardeau Contact Tracing</u>
$45,000 x 2% = $900 (Nov. '21)

8. <u>Missouri Warren County Contact Tracing</u>
$412,000 x 2% = $8,240 (Nov. '21)

Based on the information presented above, can Maximus please not only advise how they calculated my bonuses for 2020-21, but why I am not due the remaining 3X base pay amount, eligible for a general managers bonus and eligible long-term equity program?

I love Maximus as an organization and what it stands for and represents and the people I work for and with, but I am extremely disappointed and frustrated I been involved in generating over $125M in prime and sub-contract revenue for the organization over the last 18 months and I have to draft an email to be compensated per the agreement I executed in good faith with the organization, which the compensation doesn't even represent 2% of the overall contract value(s).

If I can provide you anything further as part of your review, please let me know. Thanks again for your time today.

Sincerely,

Kip

**Kip Daniels**
Vice President of Business Development & Capture

**MAXIMUS Federal**
Remote – Phoenix, Arizona (Eastern Time)
Phone: 630.229.1236
KipRDaniels@maximus.com

# EXHIBIT H

**M:** (630) 229-1236
**E:** kiprdaniels@maximus.com

---

**From:** Daniels, Kip R
**Sent:** Monday, May 2, 2022 5:03 PM
**To:** Naughton, Thomas C <thomasnaughton@maximus.com>
**Subject:** FW: Bonuses
**Importance:** High

Good Afternoon Tom,

With the month of April concluded, I wanted to follow up with you on the payment status of commissions for the 21-22 year as well as revisit the outstanding commissions I believe I am still owed from the 20-21 year and the terms of my offer letter. Below is what currently had been awarded for the current year I would like commissions to be paid at the end of May:

BioIQ: $3,639.226 x 5% = $181,961.3 (December '21)

Arkansas UI: $2,140,000 x 5% = $107,000 (November '21)
This included the new work of agents supporting DWS post COVID, IVR, licenses, etc.

Springfield-Greene County: $1,333,296 x 5% = $66,664.80 (January '22)
$241,920 x 2% = 4,838.40 (January '22)
This includes the vaccine program and purchase of COVID-19 tests.

Florida UI: $4,567,953.00 x 5% = $228,397.65 (December '21)

CAE Immunization Exemption Review: TBD
Creative Testing Immunization Exemption Review: TBD
Sabre Vaccine Verification: TBD

As for 20-21 commissions, I am going to kindly ask for the last time that I be compensated for the remaining $400,000 in commissions I am still owed. While I have outlined the basis for those commissions previously based on the below, what also was not outlined was the fact that I had a $40M sole source opportunity with Florida DEO the US Services team failed to execute in November/December of '20. In return, one of our partners was able to secure the business and since said time Federal has executed two agreements with them to provide support. The first agreement was valued at $4,697,297.77 (July '21) and the second is noted above. Thus, instead of $2M in commissions from the $40M, which would have put this entire conversation to rest due to the fact I assume it would have been capped at $600K, I am left having to draft this communication. The payment of the $234,864.88 commission from the July agreement was not outlined previously, which I should be credited for based on the information I provided to our partner to help secure this business.

However, the payment of the remaining $400K in commissions I am requesting pales in comparison to commissions, discretionary bonus and long-term equity program outlined in my offer letter that I am eligible for. The payment of salary, commissions and bonuses outlined in 19-20, 20-21 and 21-22* ($2.815M) does even equate to the commissions for the Florida Contact Tracing agreement ($2.857M) let alone the remainder of the agreements outlined above/below.

To avoid this from occurring in the future (potentially this year), I would like either the cap removed on the commissions or a more detailed understanding how discretionary bonuses and long-term equity is earned. Bottom line, I love working for you and Maximus, but the fact it is a hassle to be compensated based on the terms of my agreement is very frustrating. Please advise on the payment of my 21-22 commissions for May and the status of the remaining 20-21 commissions when confirmed.

# EXHIBIT I